## McLEAN *vs.* THE STATE.

1. In criminal, as well as in civil cases, it is within the discretion of the court, on the application of either party, to require the witnesses to be examined out of the hearing of each other, and its ruling in that respect cannot be assigned as error.

2. On the trial of an indictment for murder, the declarations of the deceased, touching the homicide, although he does not state at the time that he is conscious of impending death, if made under such circumstances as in the judgment of the court will reasonably warrant such an inference, are admissible in evidence as dying declarations.

3. Where the deceased, being asked "who shot him," replied, "the prisoner," the declaration is complete, and cannot be rejected, because, from weakness and exhaustion, he was unable to answer another question, propounded to him immediately afterwards.

4. Dying declarations are admissible in evidence, wherever their subject matter has reference to facts and circumstances, which would constitute a part of the *res gestæ*.

5. Where a witness, being asked by the prisoner's counsel why she put a particular question to the deceased just before his death, answered that she did so "in consequence of what the prisoner had told her some two hours previous," this will not authorise the prisoner to give in evidence his conversation with the witness at the time referred to.

6. The prisoner and the deceased having had a difficulty the evening before the homicide, the prisoner threatened that between the setting of the sun

on that evening and its rising on the next day, he would kill the deceased: On the next morning, the sun having just risen, the prisoner, armed with a gun, was on the road that led to the house of the deceased, and immediately before he shot the deceased, had a conversation with a witness, who was examined upon the trial: *Held*—That if the witness, without objection on the part of the prosecution, is permitted to state that the prisoner in that conversation spoke of the difficulty of the evening before, the door is opened for the admission of the entire conversation, and it is error to exclude it, so long as the other portion is suffered to remain before the jury.

7. A witness, who is not a medical man, is incompetent to express an opinion as to the particular species of fits with which any one is afflicted.

8. Where insanity is set up as a defence to an indictment for murder, the subsequent as well as previous acts and declarations of the prisoner are admissible in evidence to show his true mental condition at the moment of the homicide.

Error to the Circuit Court of Russell. Tried before the Hon. J. J. Woodward.

THE plaintiff in error was indicted for the murder of one Mavin Whatley. After the jury was impannelled, the counsel of the prisoner asked that the witnesses on the part of the State be put under the rule, which was accordingly done. The State's counsel then made a similar motion as respects the witnesses for the prisoner, which the court granted in opposition to the objection of the prisoner's counsel. Various objections were taken on the trial to the admission and exclusion of testimony, all of which, with the facts upon which they were severally predicated, will be found sufficiently set out in the opinion of the court to render the points decided perfectly intelligible.

BELSER & HARRIS, for plaintiff in error.

ATTORNEY GENERAL, for the State.

CHILTON, J.—There was no error in ordering that the witnesses should be examined out of the hearing of each other. It was a matter discretionary with the court, and cannot avail the prisoner on error. It is the uniform practice in civil cases for the court upon the application of the counsel of either party to pass such order, and the rule is the same, both in civil and criminal cases.—1 Greenl. Ev. § 432 (3d ed.) note 1 to pages

58–584, where the authorities are cited. The error first assigned must therefore be disallowed.

2. The 2d, 3d, 4th and 6th assignments, which relate to the inadmissibility of the dying declarations of the deceased as evidence, may be considered in connection. It is insisted that as the deceased had not, at the time he made the declarations proved by the witness Wade, and which were made some three hours before his death, given any evidence by his declarations that he was aware of the near approach of his dissolution, the evidence should have been excluded. The law certainly requires that to render dying declarations admissible, they must be made under a sense of impending death; for it is this sense of his danger that gives to the declaration a sanction considered equivalent to an oath. But in order to show that the party was sensible of his danger, it is not indispensable that he should state it at the time he makes the declarations, or at any time. "It is enough," says Mr. Greenleaf, "that it satisfactorily appears, in any mode, that they were made under that sanction, whether it be directly proved by the express language of the declarant, or be infered from his evident danger, or the opinions of his medical or other attendants, stated to him, or from his conduct, or other circumstances of the case, all of which are resorted to in order to ascertain the state of the declarant's mind."—1 Greenl. Ev. § 158. So in Anthony v. The State, Meigs' Rep. 265, it was held, "If the dying person declare that he knows his danger, *or it is reasonably to be infered from the wound or his state of illness,* that he was sensible of his danger, the declarations are good evidence."—1 East. Pl. Cr. 354, Tinckler's case; ib. 357–8, John's case; 6 Car. & P. 386; ib. 631; 7 ib. 187; Wharton's Amer. Crim. Law, 179-80; Anthony v. The State, 1 Humph. 265; Dunn v. The State, 2 Pike, 229; 1 Phil. Ev., C. & H. notes, from page 606 to 612, where the authorities are collected ; Chitty's Crim. Law, 569-70; Roscoe's Cr. Ev. 25. The circumstances under which the declarations are made must be shown to the judge, who is to determine upon the admissibility of the evidence.—1 Greenl. Ev. § 160, and authorities in note 4, page 257 (3d ed.); 1 Leach, 504; Chitty's Cr. Law, 570; Wharton's C. L. 183; 1 Stark. Rep. 532; 3 C. & P. 629. We think, under the rule of law as above laid down, and which

is fully sustained by authority, the facts and circumstances shown by the proof, as set out in the bill of exceptions, justified the court in admitting the declarations of the deceased.—It is needless to refer to these facts further than to state, that the deceased had just been shot down, having received sixty small shot in his body, penetrating a vital part, the right breast: that considerable blood flowed externally, as well as into his chest, passing thence into his mouth: that he did not speak from the time he was shot down until taken to the house, and his wounds dressed: and that he was in extreme agony and suffering. It further appears, that in a very short time after he made the declarations to the witness, Wade, he stated to another witness, Mrs. Graves, that he must die, which was repeated. Under such circumstances, if the deceased was sensible of anything, he must have been aware that death was immediately to follow, and was inevitable.

3. It is, however, objected to the declarations proved by Mrs. Graves, that they are imperfect and were not completed by the deceased, and that not having answered all he intended answering, what he did say should be excluded. It appears that this witness, a short time before the death of the deceased, and after he stated that he was going to die, asked him who shot him—he replied, the prisoner. She then asked him the cause of it, but from weakness and exhaustion, the deceased could not and did not answer her question, but shook his head. It is said to be no objection to such declarations, that they were made in answer to leading questions; but that the statement, whatever it may be, must be complete in itself; for if incomplete—if it appear that the dying man intended to connect his statements with qualifications and explanations, which from any cause he was prevented from making—the declarations, so remaining incomplete and unexplained, should be excluded from the jury.—1 Greenl. Ev. § 159, p. 257; Commonwealth v. Vass, 3 Leigh's Rep. 786; Rex v. Fagent, 7 C. & P. 238. The declaration, however, in this case, was complete, and it is not shown that he intended or desired to connect it with any other fact or circumstance, explanatory of it. He simply stated that the prisoner shot him, without attempting to explain the circumstances attending it.

4. It appears that this same witness, Mrs. Graves, asked the

deceased, some five minutes before his death, "whether or not he had forbid the prisoner walking the road that morning, immediately preceding the time that prisoner shot him,"—he answered, "he did not." It is insisted by the counsel, that this answer, relating to a fact distinct from the killing, or shooting, was improperly received as evidence. The law is well settled, that dying declarations are not to be received as evidence, except in cases where the death is the subject of the charge, and the circumstances of the death the subject of such declarations.—1 Greenl. Ev. § 156; 1 Chitty's Cr. Law, 569; 2 B. & C. 605-8; Wharton's Cr. Law, 181. The question propounded by the witness to the deceased involved a statement supposed to have been made by him to the prisoner *immediately* preceding the shooting, and which would thus have constituted part of the *res gestæ*—a circumstance in the unfortunate and fatal occurrence tending to explain it. It had reference to, and was *immediately* connected with the circumstances of the death, and in this light was properly permitted to be given in evidence.

5. There was certainly no error in refusing to permit the conversation had between the prisoner and Mrs. Graves, after the shooting, and in consequence of which this witness propounded to the deceased the question above alluded to, to go to the jury. The witness had not detailed any part of the conversation, which would require that the whole should be made evidence. She was merely asked by the prisoner's counsel, "why it was that she had put such a question to the deceased five minutes before his death," and in response to this enquiry, stated that she had asked the question in consequence of what the prisoner had told her some two hours previously. We know of no rule of law which would permit a party thus to make evidence for himself by proving his own declarations, as original evidence, constituting no part of the *res gestæ*. Had the State given in evidence a part of his conversation, then the defendant would have been entitled to have proved the whole of the conversation had at the same time in reference to the same subject-matter.—1 Greenl. Ev. § 201. But such was not the case before the court. No part of what the prisoner had stated to the witness was deposed to by her, and it was, as we have said, merely alluded to at the request

of the prisoner as a reason for propounding the question by the witness. This view disposes of the 5th assignment of error.

6. It appears that upon the examination of one Edwards as a witness on the part of the prisoner, he stated that on the morning before the shooting, he had left the house of the prisoner in company with him, and as they were travelling in the direction of the house of the deceased, " the prisoner mentioned to him the fuss which had occurred the day before," and the counsel desired the witness to detail the whole conversation had at that time in regard to the difficulty. This the court refused, and decided that no portion of the declarations of the prisoner had gone to the jury, so as to render the conversation sought be elicited legitimate, and refused to exclude that portion of the conversation relating to the difficulty. The decision of the court upon this point constitutes the 7th assignment of error. Had the counsel for the prosecution remained silent and permitted the witness without objection to detail a portion of the conversation, such portion as he deemed made against the prisoner, we do not think it would have been permissible for him to have cut short the examination at this point, and to have availed himself of such partial statement as evidence against the deceased. It is manifest that in this way great injustice might result from garbled statements deposed to by witnesses, which, when explained by the remaining portion of the conversation, would become harmless. It is the right of the counsel for the State, to object and arrest the witness in his evidence as to the declarations of the prisoner, which are not evidence when offered by himself, but in such case, it would be the duty of the court to see that injustice was not done by permitting a partial or imperfect account of such declarations to be retained as evidence to the prejudice of the party offering them. If the prosecution insisted upon the portion already detailed, he thereby makes the evidence his own, and justifies the court in permitting the whole of the conversation to be proved. On the other hand, it is his clear right to move their total exclusion.— In this case however, it is insisted by the counsel for the State that no declarations in respect of the difficulty had been proved, and that the prisoner merely mentioned the " fuss"—that is, the conversation turned upon that subject, but what was

said upon it was not stated. Hence he insists that the State had the right to retain the evidence, that he mentioned the difficulty without opening a door for the proof as to the manner in which he made allusion to it. Taken in connection with the other testimony and the situation and conduct of the prisoner at the time he made mention of the difficulty, it cannot be denied but that the bare mention of the subject was a strong circumstance in the cause. The evening before the deceased was shot, he and the prisoner having had a difficulty, the prisoner made a threat that between the setting of the sun on that evening and its rising on the next day, he would kill the deceased. On the next morning, the sun having just risen, he was on the road which led to the house of the deceased, armed with his gun. Just before the shooting, and as the witness left the prisoner, he mentioned the difficulty which had taken place the day before. What is the effect of this declaration? Its obvious tendency was to induce in the minds of the jury the belief that the prisoner remembered the threat that he had made—that it was in his mind, and constituted the object of his visit. It is thus connected with the fact of his going in the direction of the residence of the deceased, and with the firing of the gun, which took place in a few minutes afterwards. As the declaration or statement of the prisoner, " mentioning the fuss," unexplained, was calculated to operate to his prejudice, we think it should have been excluded from the jury, or the entire statement or conversation upon that subject had at the same time should have been submitted to them.—2 Phil. Ev. C. & H. notes, 223 to 230; Greenl. Ev. § 201, 202. If mentioning the difficulty was considered by the prosecution as proper evidence for the jury against the prisoner, it was the right of the latter to show how it was mentioned, as explanatory of the circumstance arrayed against him, and what language the prisoner used in mentioning it. This position is so obvious as to require no argument to sustain it.—9 Yerg. Rep. 280, 281; 5 Mod. Rep. 165. The court did not err in refusing to permit the accused, after the State had given in evidence his declarations, proving threats against the deceased, to prove that in a subsequent conversation at a different time, not had with the deceased, or in his presence, but with a third party, he retracted the threats. The allow-

ance of such declarations violates the rule above alluded to, that the party's own declarations, not forming part of the *res gestæ*, and no part of which has been insisted on by the opposite side as evidence, cannot be allowed to be proved in his favor.—Bradford v. Bush, 10 Ala. Rep. 386. We might here close this opinion, but as there are other questions presented by the record before us, and which will doubtless arise upon another trial, it becomes our duty to settle the law in respect of them.

7. The plea of insanity was insisted on for the prisoner in the court below. In support of this defence, he proved that in 1825, he was a healthy man, and then resided in Washington county in the State of Georgia; that in 1829 he became paralized, losing the use of one half of his person; that he remained in this condition under medical treatment for about eight months, and slowly recovered; that about the year 1830, he became very intemperate in the use of ardent spirits; that in 1835, he was accidentally shot through, and was again prostrate from this cause a number of months; that from these combined causes, his conversation became incoherent, his countenance changed, and his conduct was accompanied with restlessness, and extraordinary attitudes and motions—with attempts to spit without expectoration, and with uncommon groans, hollowing, and night mare; that he also expressed a belief that the deceased was about bringing a lewd woman from Columbus, in the State of Georgia, into the neighborhood. It was further proved, that a few years before the killing took place, the prisoner had been afflicted with fits, and that a week preceding the killing, he had several more in the presence of one Edwards, who was introduced as a witness and testified as to the manner in which they affected the prisoner. The prisoner's counsel desired this witness to state what kind of fits they were which the prisoner had, and the witness not being a medical man, the court refused to allow him to answer the question. We suppose the counsel desired the witness to give a name to them, as the peculiar manner in which they affected the prisoner was allowed to be proved. This the witness was incompetent to do. There was nothing peculiarly within the knowledge of the witness which enabled him to arrive at a more correct conclusion than the jury as to the pa-

thology of the disease. Whether it was *delirium tremens*, induced by the excessive use of intoxicating liquors, or the result of the suspension of the cerebral functions, usually, I believe, denominated apoplexy, or were epileptic in their character, are inquiries which, so far as they were important, could as well have been determined by the jury as the witness, and were for this reason properly excluded. Such evidence does not come within any of the exceptions to the general rule, that opinions of witnesses, not experts, are not to be received as evidence.

As to what shall constitute evidence of insanity *at the time* of the commission of the offence, is often a delicate and perplexing question. In this case, there was some evidence adduced *tending* to show that the party at the time he killed the deceased was laboring under mental aberation, and the question was presented in the court below whether the acts and declarations of the prisoner on the day after the killing took place, evincing insanity at the time of the homicide, could be given in evidence. The court ruled that neither the prisoner's acts nor declarations, *after* the alleged offence was committed, could be received as evidence of insanity *at the time* the act was done. In this view we think the judge clearly mistook the law. Insanity, or a diseased state of the mind, must be proved to the jury, like other diseases, or facts, and it is laid down generally, that evidence of the state of his mind, both before and after the act done, is admissible.—2 Greenl. Ev. § 371. In Grant v. Thompson, 4 Conn. Rep. 203, 208, it is stated as the invariable practice to go into a connected history of the supposed lunatic's mind, both before, at, and after the act, for which he is sought to be charged, in order to arrive at his precise mental condition at the moment.—See also Dickinson v. Barber, 9 Mass. Rep. 225 ; Kinnie v. Kinnie, 9 Conn. Rep. 102. A diseased mind, like a diseased body, must be judged of from its symptoms. In the language of a modern writer upon the subject, " the malady assumes so many forms and exhibits itself in such *Protean* shapes, that it is out of our power to give any thing bearing the semblance of a correct definition of the disorder,"—Winslow on Ins. 69—yet it has its peculiar characteristics and symptoms from which we are to determine its existence and the nature and extent of it.

McLean v. The State.

These, in the nature of things, must consist of the acts and declarations of the party, coupled with his appearance, and physical condition. Proof that a man is deranged to-day is not conclusive that he was in the same condition yesterday. The force of such testimony depends much upon the causes which produced the disease, and its nature and character, as well as the proximity of the diseased mental *status* to the act with which it is sought to be connected. The jury, however, are the appropriate judges of the weight which should be attached to such evidence. But it is said that although the authorities are numerous applying this rule in civil cases—for example to the acts and declarations of testators *after* making their wills, proving insanity at the time of executing them, also to the subsequent unsoundness of property warranted, so near the time of sale as to furnish a reasonable presumption as to its condition when sold, yet such proof must be confined to civil cases. That the ease with which insanity may be simulated, and the difficulty of detection, is a sufficient reason for not applying it to criminal cases. This proves too much, for the same reasoning would exclude all evidence of insanity in criminal cases, since the prisoner could as well feign himself insane before, or at the time of the commission of the offence, as afterwards. We know of no such distinction, and are unwilling to make it. True, we are refered to one decision by the Attorney General, which holds that a prisoner may not prove his subsequent acts and declarations indicating insanity made after the homicide was committed by him.—State v. Scott, 1 Hawks Rep. 24. But this case stands alone so far as my examination has enabled me to discover, and is unsupported either by authority or satisfactory reasoning:—Indeed Judge Henderson, who delivered the opinion, expressed in no equivocal terms his disapprobation of it, and the same court in Norwood v. Morrow, et al, 4 Dev. & Batt. 442–451, delivered an able opinion, holding the doctrine as we have above stated it, against which, they say, they are not aware of any thing, unless it be the case of the State v. Scott, *supra*, with the reasoning of which they own they are not satisfied. Our conclusion is, that the risk of deception, which such evidence affords, while it furnishes a strong reason for narrowly scanning the proof, and for attaching to it less weight, is still no reason for

48

its exclusion. Less injury, however, may be apprehended from it than the Attorney General supposes, since "the jury are to determine what weight is due to it, and in all such cases they should be told that every man is to be presumed sane, and to possess a sufficient degree of reason to be responsible for his crimes, until the contrary be proved to their satisfaction; and that to establish a defence on the ground of insanity, it must be clearly proved, that at the time of committing the act, the party accused was laboring under such a defect of reason from disease of the mind, as not to know the nature and quality of the act he was doing, or if he did know it, that he did not know he was doing wrong."—2 Greenl. Ev. § 373 ; State v. Brinyea, 5 Ala. Rep. 241.

Let the judgment be reversed, and the proper order entered remanding the cause, and for the safe custody of the prisoner until discharged or otherwise disposed of according to law.