Nick Walker v. The State.

---

NICK WALKER v. THE STATE.

39 221
72 405

1. PRACTICE: *Objections to evidence: Bill of exceptions.*
   Where an objection to the admissibility of testimony, or a motion to exclude it, is overruled, the objection, or the motion, and the ruling of the court, and exceptions to the ruling, must be shown in the bill of exception, and the ruling of the court made a ground of new trial, or they will not be noticed in the Supreme Court.

2. EVIDENCE: *Dying declarations.*
   Dying declarations, like the testimony of a witness in court, must be of facts, and not of opinions.

3. SAME: NEW TRIAL: *Same: Infamous witness.*
   The dying declarations of one convicted of burglary and larceny, are not admissible as evidence; but, when the infamy of the declarant is discovered after verdict, a new trial can not be demanded as a right. The motion in such case is addressed to the sound discretion of the court.

APPEAL from *Pulaski* Circuit Court.

Hon. F. T. VAUGHAN, Circuit Judge.

Nick Walker v. The State.

*John A. Holt*, for appellant:

1. There was error in permitting the dying declaration of the deceased to go to the jury on the second trial. It was a mere expression of opinion, and should have been excluded. (*Greenleaf, sec. 159; Whart. Cr. Law, vol. 1, sec. 678.*) It may be contended that, being good on its face, it was admissible. It is not necessary that it bear on its face the blemish of inadmissibility; it is sufficient if it appear when taken in connection with the circumstances. The judge must decide this question, not the jury. (*Greenleaf, sec. 160.*) Nor can it be left to the jury to be weighed and disregarded if worthless. *State v. Williams, 67 N. C.*

2. After the trial, Jenkins was ascertained to have been convicted of felony. A dying declaration is but testimony, and the declaration incompetent. (*Williams v. The State, ubi supra.*) This was not *strictly* new undiscovered evidence, tending to impeach a witness. It goes to the *competency* of Jenkins, and incompetency says that a witness *shall not testify at all.*

Discusses *Graham & Wat. on New Trials, p. 988, vol. 3*, and *Conith v. Green, 17 Mass., 515*, contending that it is mere *obiter dicta*, etc. The law does not require an impossibility of a man.

3. The testimony of Aiken was hearsay and irrelevant, from which hurtful inferences would naturally be drawn by the jury. (*Graham & Wat. on New Tr., vol. 2, 612.*) It was neither original evidence nor part of the *res gestæ. Greenleaf, secs. 100-1-8, vol. 1.*

*Attorney-General Moore*, for the State.

ENGLISH, C. J. Nick Walker, the appellant, was indicted for murder, in the Circuit Court of Pulaski County, at the September term, 1882. There were two counts in the

indictment, the first charging, in substance, that he murdered Tom Jenkins on the twenty-eighth of August, 1882, by shooting him with a gun ; the second charging that he murdered him by shooting him with a pistol. Both counts contained apt words to make an accusation of murder in the first degree, under the statute.

The defendant was tried on plea of not guilty; the jury found him guilty of murder in the first degree; a motion for a new trial was overruled; he took a bill of exceptions, and, on the third of November, 1882, was sentenced to be hung on the twenty-first of December following. The execution was suspended by allowance of appeal by one of the judges of this court.

The grounds of the motion for a new trial were :

That the verdict was against the law and evidence.

That the court erred in admitting part of the testimony of Emanuel Aiken.

And in admitting the dying declaration of Tom Jenkins.

That defendant had discovered, after the trial, that Tom Jenkins had been rendered infamous by conviction and sentence to the penitentiary for burglary and larceny, in the Pulaski Circuit Court.

I. The general charge of the court below to the jury was clear, and fair alike to the State and to the prisoner, and no objection was made to it, and all of the instructions asked for the prisoner were given.

There is no statement in the bill of exceptions, as there should have been, that it contained all of the evidence introduced on the trial.

It probably did, however, set out all the evidence, and it has not been submitted in argument here, that the evidence was not sufficient to warrant the verdict. It discloses a shocking murder, and the facts in proof point to the prisoner as the guilty agent of the crime.

Nick Walker v. The State.

On the evening of the twenty-eighth of August, 1882, about 8 o'clock, Tom Jenkins was sitting in his room, in Argenta, with his right side near the closed door, eating his supper. He was shot from without, with a pistol, no doubt, through an auger-hole in the door, the ball passing through the right side of his skull, and lodging in his brain, inflicting a mortal wound, of which he died about nine days afterwards. The pistol, when fired, was placed so near the hole in the door that it was powder-burned.

The prisoner had quarreled with and threatened Jenkins. A few minutes before the fatal shot, he was seen with a pistol, and said he would kill Jenkins. He was seen by several witnesses going in the direction of the room occupied by Jenkins, and also seen running away after the pistol was fired.

These are some of the leading facts in evidence. It would serve no useful purpose to state in detail all the facts in proof conducing to prove the guilt of the prisoner.

1 PRACTICE: OBJECTIONS TO TESTIMONY: Bill of exceptions. II. Emanuel Aiken was a constable, and kept a saloon in Argenta, and rented to Jenkins the room occupied by him, which was about forty feet from the saloon. He testified that he knew defendant, and saw him knocking about his saloon on the twenty-eighth day of August, about 3 o'clock p.m., of the day that Jenkins was shot. That just after dark of the same day, being across the river, in Little Rock, he was notified that Thomas Jenkins was shot, and being constable, went down the street, and crossed the river to the scene of the murder, to make inquiry. "I had a talk with the wounded man, as soon as I arrived, and before he had been removed, and from information received from him in that conversation, and from circumstances which I knew myself, sent my men to arrest the defendant, Nick Walker." *To this the defendant excepted—i. e., that the conversation with deceased caused him to arrest defendant.*

This is all there is in the bill of exceptions about the admission of this testimony, which was assigned as an error of the court, in the motion for a new trial. It does not appear that a motion was made to exclude it, that the court overruled the motion, and defendant excepted to the ruling of the court, which is the proper practice, as will be shown below. See *Gantt's Digest, secs. 1977–79*.

But, the matter of practice aside, there is nothing in the point. The witness did not state, and was not asked to state what information he received from Jenkins. He stated no fact as coming from him—repeated nothing said by him—to be classed as hearsay. He merely stated that upon information received in a conversation with Jenkins, and from circumstances within his own knowledge, he caused defendant to be arrested.

It may be added here that it was proved by other witnesses that after the report of the pistol, and after defendant had been seen running from the house occupied by Jenkins, he changed his clothing, and went into a church, and when arrested there he denied that he was Nick Walker.

III. All that is stated in the bill of exceptions about the admission of the dying declarations of Jenkins follows:

Mother of deceased stated: "I am the mother of Tom Jenkins, who was shot in Argenta last August. He was carried to my house in Little Rock, after he was wounded, and my daughter and myself waited on him, and nursed him until his death, which occurred about nine days after the shooting. On the evening of his death he talked sensibly. He had his mind apparently (he had been at times delirious), and he said, 'Mother, I can not get well; I am going to die; Nick Walker shot me. I was singing over a ham-bone, and did not know I was shot until I came to myself; for, when the gun fired, a thousand bells

were ringing in my head.' My son told us he was going to die; my son knew he was going to die; he said so." (Defendant's exceptions noted.)

"*Defendant's exceptions noted!*" What exceptions? To what rulings of the court did the defendant except? The bill of exceptions fails to show. If the defendant objected to the admission of the above testimony of the mother of the deceased, or any part of it, and the court overruled the objection; or if, after the admission of the testimony, the defendant moved to exclude the whole, or any part of it, and the court overruled the motion, the bill of exceptions should have so stated, and that defendant excepted. And the ruling of the court should have been made ground of the motion for a new trial. This is a well established rule of practice in criminal as well as civil cases, and one that any attorney of ordinary intelligence, defending one charged with crime, either by retainer, or appointment of the court, can and' should understand and observe. See *Burris v. State, 38 Ark., 221; Green v. State, ib., 304.*

In a criminal trial the accused may except to any decision of the court prejudicial to his substantial rights, but the exception must be shown upon the record by bill of exceptions, as in civil cases. *Gantt's Digest, secs. 1977–9.*

3. EVIDENCE Dying declarations must be of facts and not of opinions.

But though the question is not properly presented by the bill of exceptions, we do not object to ruling upon the objection made in the argument of the learned counsel for appellant here, to the competency of the dying declaration of Jenkins to his mother, "*Nick Walker shot me,*" as testified by her. It was submitted in the argument that this declaration should have been excluded by the court below from the jury, on the ground that it was the expression of an opinion or belief of the declarant that Walker shot him, and not the statement of a fact. It was insisted that the court should have decided, as matter of law, upon

the facts and circumstances stated by other witnesses, that Jenkins could not possibly have seen who shot him; and, therefore, his declaration that Nick Walker shot him, was necessarily an opinion or belief, and should have been excluded from the jury.

The authorities are agreed that a dying declaration is not admissible if it is a mere expression of opinion or belief. *1 Greenleaf Evidence, sec. 159; People v. Shaw, 63 N. Y., 38; Johnson v. State, 17 Ala., 622; Wharton's Cr. Ev., sec. 292;* and cases cited in note.

As a general rule, a witness in court must state facts, and not give opinions, and so with a dying declarant.

We can not undertake to say, upon the facts and circumstances in evidence, as stated in the bill of exceptions, that it was physically impossible for Jenkins to have seen, so as to recognize, the person who shot him. The witnesses do not state the size of the auger-hole in the door through which he was shot. It is probable that the assailant had his face parallel with the hole, and saw his victim when he fired the pistol. A witness who was in bed, stated that there was a light in the room at the time, and that it was dark out of doors. It was not, however, it seems, too dark for witnesses to recognize appellant when going toward the room occupied by Jenkins, and when running away, after the report of the pistol was heard.

Counsel for appellant relied in argument on *State v. Williams et al., 67 North Carolina R., 12.*

In that case the dying man said: "It was Edward Williams who shot me, though I did not see him." And in reply to a question asked him by the witness as to who shot him, he said, "I don't know what those poor creatures shot me for; it was Ed. Williams who shot me, but I did not see him."

The trial court, against the objection of defendants, per-

mitted these declarations to go to the jury for what they were worth.

In that case, the deceased was shot after dark in his house, by some one standing outside, through an aperture between the logs of which the house was built. He was sitting by the fire with his side near the aperture, and was shot in the side.

The Supreme Court held the declarations inadmissible, on the ground that the deceased accompanied each declaration that it was Williams who shot him, with the qualification, "but I did not see him," which showed that he was expressing an opinion, and not stating a fact.

If, in this case, Jenkins had said, "Nick Walker shot me, but I did not see him," it would have been like the case relied on.

In *State v. Arnold, 13 Iredell Law (N. C.), 184,* it was decided that in the trial of an indictment for murder, where the dying declaration of the deceased is, that "A. B. shot me, or has killed me," the court must presume, *prima facie,* that the deceased intended to state a fact of which he had knowledge, and not merely to express an opinion. That the jury must judge of the weight of this, as of other evidence, by the accompanying circumstances. If he merely meant to express his opinion as an inference from the other facts, the jury should disregard it as evidence in itself.

In *McLean v. State, 16 Ala., 672,* the deceased was asked by a witness who shot him, and he replied, "the prisoner;" he simply stated that the prisoner shot him, without attempting to explain the circumstances attending it, and it was decided that the declaration was admissible.

In *Binnes v. The State, 46 Ind., 313,* it appeared from the declarations made by the deceased that she was merely expressing an opinion that her husband killed her, and not

stating it as a fact, and the declarations were held inadmissible.

If deceased had been on the stand as a witness, and stated that Nick Walker shot him, and nothing more, it would have been competent testimony. But if, on cross-examination, he had shown that he was merely stating an opinion or belief, and not a fact within his knowledge, it might have been excluded. One accused of murder has in no case the opportunity of cross-examining the person slain, but his dying declarations are nevertheless admissible. The accused is confronted by and may cross-examine the witnessess who prove the dying declarations.

We think in this case that the declaration made by Jenkins, at the time when he believed he was about to die, was competent to go to the jury for what it was worth, and that it was their province to judge of its weight, by comparing it with the facts and circumstances in evidence. The declaration, when considered in the light of the attending circumstances, could not have been of much value, and it is not probable that the jury regarded it as of much weight.

But whether Jenkins could or might have seen the person who shot him, was a question of fact for the jury, and not of law for the court.

IV. If it had been shown by the record, when the dying declarations of Jenkins were offered in evidence, that he had been convicted of burglary and larceny, they should have been excluded. (*Gantt's Digest, sec. 2482.*) When the declarant, if living, would have been incompetent to testify, by reason of infamy, and the like, his dying declarations are inadmissible. *1 Greenleaf Ev., section 157.*

1. NEW TRIAL: Dying declarations of infamous witness.

This court has repeatedly decided that newly-discovered evidence that goes only to impeach the credit of a witness

is not a sufficient ground for a new trial. *Campbell v. The State, 38 Ark., 509*, and cases cited.

So where it is discovered after verdict that a material witness had been convicted of a felony, and was therefore incompetent, a new trial can not be demanded as a right. The disability should be ascertained, be established by competent proof, and the objection be made before the case is submitted, in order that if his testimony is excluded, the party calling him may have an opportunity of supplying evidence. The motion for a new trial in such case is addressed to the sound discretion of the judge presiding at the trial. *3 Graham & Waterman on New Trials, 988.*

The rule was so announced in a clear and well sustained opinion by Chief Justice PARKER, in *Commonwealth v. Green, 17 Mass. R., 532.*

The bill of exceptions shows that the court below overruled this ground for a new trial, because, in its opinion, the verdict was amply sustained by legal and competent testimony, other than the dying declarations of Jenkins. No attempt was made to impeach the veracity of any witness examined at the trial.

We have not overlooked the fact that the record shows a former trial in which the jury failed to agree upon a verdict, and a statement of counsel that the dying declarations of Jenkins were not introduced on that trial, but we have no legal means of knowing that, as the evidence, whatever it may have been, was not brought upon the record by bill of exceptions, and, if it had been, it would not have been considered on this appeal.

Upon the whole record the judgment must be affirmed.

### DISSENTING OPINION.

EAKIN, J. Concurring fully with my associates upon all other points, and being, like them, indubitably satisfied of

the guilt of the appellant, I am, nevertheless, unable to approve the admission of the dying declarations of the murdered man.

It would serve no useful purpose to discuss the grounds upon which dying declarations are admitted, or how the practice may be reconciled with the constitutional right of the accused to meet the witnesses face to face upon the trial. It is fixed now, beyond question, that in cases of homicide they are admissible, if made as to *facts*, under circumstances of known impending death, by the dying person, with regard to the agency of the mortal injury.

Yet it is known and felt, by jurists, that they contravene all the reasons by which hearsay is excluded; that they are often made in the midst of perilous and agitating circumstances; often under the blinding influences of hate and passion; often when the failing physical powers should make us distrust the full coherence of mental ideas; rarely cool, deliberate and circumstantial, and always without the highest crucial test of truth, the power of cross-examination. They are apt to be made before, and repeated by, ignorant persons, who are not used to analyze the language of others, or measure their own. The idea that the awful sense of the future life, and the loss of all interests in this, is equivalent to the obligation of an oath, was only a theory, which has been abandoned by men who know the world; and, even if it were true, there is still an absolution from all punishment for perjury, a more potent incentive to truth. Indeed, their admission in the exceptional case of homicide, and total exclusion in all other cases, civil or criminal, is an anomaly of the common law, which can have no logical justification but necessity. It is simply thought that the protection of society requires it. I can not say that it does not. But I am deeply impressed with a conviction of the danger which may lie on the other side—

the conviction of the innocent—if this branch of evidence be not confined within strict limits, and, where it is not competent, excluded wholly from the jury.

Let us not confuse competency with credibility or weight. The latter is for the jury alone. The former is determined by the court as a preliminary question, and, in determining it, the court has the same power to consider surrounding circumstances as the jury has after it is admitted.

The whole of the dying declaration is given by the court. So far as it affects defendant, it is in the simple words, "Nick Walker shot me." It is conceded that, if it were an opinion, it should have been excluded. It was admissible only on the ground that it was a statement of a fact within the knowledge of the declarant.

So bold a statement of a general fact does not imply personal knowledge of the circumstantial facts. It is the language of a belief, as well as of personal knowledge—the natural and usual expression of a mental conviction, however derived. Standing alone and unexplained, it has been held, as the court shows, to be *prima facie*, a statement implying personal knowledge. I doubt whether this be a reasonable position ; but, even if it were, the court shows that it has been held judicially, also, that it may be explained by qualifications showing that it was, indeed, a mere conviction of the mind. There is, generally, no opportunity for the cross-examination of a dying man on behalf of the person charged with the death. No qualifications can, at the time, be asked by *him;* and the bystanders are not apt to worry the dying man with cross-interrogations. Who knows but if the deceased had been then asked if he saw his slayer, or heard his voice, he would have answered "No ! but I do not doubt it was he that did it."

In forming an estimate of the declaration I think the

honorable Circuit Judge had the power to consider the surrounding circumstances, to determine whether the deceased meant to assert a fact within his knowledge, or a mere mental conviction, which should be excluded from the jury, just as he should determine from the circumstances whether the declarations were made in view of impending death. I think, too, he might, in doing this, avail himself of his ordinary knowledge of human affairs as freely as a jury might in determining matters committed to them. It does not seem proper, in such cases, to leave it to the jury to determine *first* whether the statement was an expression of an opinion or a matter of personal knowledge; and *then*, if they found the latter, to consider its weight. When admitted, it goes at once as a statement of a fact, and leaves the jury only to determine its credibility and weight. For facts alone, whether testified to directly or brought in by dying declarations, are all that they *can* consider.

When, on the trial, exceptions were taken to this evidence, it had already been proven by the State herself that the deceased had been shot through an auger-hole in a door, whilst sitting at a table a few feet away, singing over a ham-bone which he was eating. That it was dark out of doors; that he fell at once unconscious; that there were two other persons in the room, lying in the bed, wide awake, and observing what was going on, and that neither of them, testifying fully as they did, and minutely as to the circumstances, give any intimation of any voice or sound, or opening of the door, even for a moment, to enable any one to peer into the darkness. I think we may all judge of the meaning of an auger-hole, and the size, even a large one, through a door. It is not in the ordinary course of human affairs to use other than carpenters' augers for holes in doors. The usual purpose in humble dwellings is to afford a fastening for a chain, which requires only a

small orifice. If the deceased at the time had personal knowledge that Walker shot him, he must have seen and recognized him through this auger-hole, looking out into the darkness from his position where he sat eating and singing over a ham-bone, with his head turned away. For he was not shot in the front, but in the side of the head.

I conceive this utterly impossible to the human faculties. The deceased could not have had any evidence *of any of his senses* that it was Nick Walker who fired the shot. Circumstances made this as strong as if he had added, "but I did not see him." It is easy enough to understand why the deceased made the assertion. He had a bitter quarrel with Walker about a prostitute. Immediately after the shooting public attention was fixed on Walker, who was arrested and in custody for the crime. No doubt the committing trial had been had, and the evidence taken, before the declaration was made. It was on the evening of his death, and he lived about nine days. What was in everybody's mouth was a certainty in his mind. He *knew* Nick Walker had shot him, and naturally said so. It was an opinion, nevertheless, and should not have gone to the jury.

The opinion of the court, just rendered, is final. The case can never go to another jury, and I have, therefore, no hesitation in saying, as an individual, that my conviction of Nick Walker's guilt is as firm as his victim's could be. It is shown, beyond all question, by the other evidence in the case. But we can not look into the minds of jurors to speak for them, and, in my view, his Honor, the Circuit Judge, was mistaken in allowing this particular item of evidence to be added to the others, and I have felt it my duty, under the law, to express my dissent from a ruling which, I fear, may become a dangerous precedent.

If the guilt of Nick Walker can be made plain by unexceptionable evidence, the mere delay in the execution of a

criminal would be more than compensated to society by preserving the certainty and consistency of our rules of evidence; and by the assurance which every person may have, that, if indicted for crime, the courts will see to it that competent evidence alone shall be brought against him, however convincing other circumstances may be. If any difference be proper, the strictness of the rule should be in proportion to the atrocity of the crime. If it can not be made otherwise plain, he ought not to be convicted. I would much prefer to direct a new trial.

With regard to a technical point of practice, I may add that I think the bill of exceptions shows, although informally, that defendant excepted to the evidence of the dying declarations upon the trial, and made their admission one of the grounds of his motion for a new trial. This, I think, in a matter involving life, should be enough to enable us to consider of any error.