KALB *v.* THE STATE.

No. 14406. March 11, 1943.

*Joseph G. Collins* and *Hammond Johnson,* for plaintiff in error.

*Ellis G. Arnall, attorney-general, G. Fred Kelley, solicitor-general,* and *A. J. Hartley, assistant attorney-general,* contra.

BELL, Presiding Justice. Jesse Kalb and Thomas Emmett were jointly indicted for the offense of murder, and on separate trials were convicted of the offense charged. In the case of Emmett the verdict contained no recommendation. On the trial of Kalb the jury recommended mercy. Each defendant moved for a new trial, which the court refused, and the defendant excepted. In the order of their appearance, we have dealt first with the writ of error as brought by Emmett, and we now have for determination the case of Kalb.

While the exceptions were different in most instances, some questions were common to both; and we have studied the cases together, both as to the law and the facts.

The statement made in the Emmett case will illustrate in a general way the nature of both cases so far as the State's contentions were concerned, and will render unnecessary any extended statement in the instant case. See *Emmett* v. *State,* ante.

The defense made by Kalb, however, was entirely different from that asserted by Emmett, in that he conceded that an unlawful assault was made upon McConnell, and that he himself had a part in it, insisting, however, that in all that he did he was acting under duress exerted by Emmett.

In his statement on the trial he explained how he happened to be traveling with Emmett, and told of their arrival and stay at McConnell's place. He stated that they purchased a pint of whisky from McConnell, and that he later gave them a pint, and that they sat around, drank, and talked. Concerning other matters, including the actual assault, he stated:

"He [Emmett] got in the car, and me and Mr. McConnell pushed it off down the grade, and it cranked up, and he left. Neither one of us expected him to come back; we figured he would head on to Gainesville. Me and Mr. McConnell went down the road towards the edge of river, and we was talking about this big sand-pile down there and about a power line by his barn, and I asked Mr. McConnell about spending the night with him and also staying until I could catch a way back to Atlanta, and he says, 'That is all right; you can stay as long as you want to.' He said, 'I am expecting a man to come by in the morning which is going to Atlanta,' and says, 'I will get you back to Atlanta; you can ride with him.' We came out to his barn and talked about his barn; he had a nice barn there, and we come on by the house up to the wood-pile, and he asked me would I get an armful of wood to put on the fire, and I told him I would, and I got up an armful of wood, and Mr. McConnell he went on in the house, and I taken the armful of wood on in, and he wasn't in the room where the fire was when I went in. I put the wood on the fire, and I could hear an argument sounded like somebody arguing. Just over a few steps from the fireplace there was a door went into another room. I never had been in there before until I went in there then. I walked over there and walked into the door, and when I walked into the door I could see him and Emmett. Emmett hit him with the butt of the shotgun; so I went walking on up to Emmett. I thought I would take this gun away from him or get him off of Mr. McConnell, and he hit me across the head with the shotgun and knocked me down on the floor, and there was a few seconds I would say it knocked me addled. When I finally got on my feet, the shotgun was lying on the floor, and he had a pistol—this gun here looks like it is the one—pointed at me. He says, 'Take your belt off.' So I did. I was scared—scared not to, and I took my belt off, and he says, 'Tie the man's feet up.' Mr. McConnell was leant back against a trunk with his feet kinder stuck out. I got down on my knees and started to put the belt around his feet, and the old belt was about half broke in two—it was rotten; and when I started to pull it, why then the belt broke, and I reckon Mr. McConnell was knocked unconscious or like myself when I was first knocked down—addled enough to where he got the idea they tied him up. I guess he remembered my tying him up, but he did not

realize I was forced at the point of a gun at the back of my head. I got up from there when the belt broke, and he says, 'Get this blanket off of that bed over there,' and I got the blanket and I was standing pretty close to the door that went out into the hall, and he says, 'Tear me off a strip,' and I don't just remember whether I had a knife and was trying to cut or tear it or just what, but I looked around at him and I says, 'What you want to beat this poor old man up for?' I did not know what the reason why he was doing this, and he spoke out something like 'You yellow something,' and whacked me across the head with a pistol. I fell about halfway out in the hall, and when I come to I was crawling out on the porch. I got up. I don't know just how long I was in that shape, but I would say a few minutes and I come to; when I began to come to where I could realize where I was at and what happened, I raised up and looked across the hill there, and I figured I would go that way across that road and get up on the highway where I could go to somebody's house or something, and about that time he walks—comes out in the hall and grabs me in the pants and marches me down to the car. When he came out in the hall he said, 'You thought you would get away from me, didn't you?' and got me by the pants and took me to the car.

"We got in the car and he let it roll down the hill, and it cranked, and when we got down to the barn and started to turn around and the car choked down. So he made me get out on the side and crawled out behind me, and there was a man we saw that morning had these two mules there. I would say he was unhooking them—had the harness off of them, and he had them at the barn; and so we walks on up to the barn. Emmett was behind me toting this gun in his hand, and I was scared—he scared this man. I remember him pointing the gun and threatening the man's life and scared the man, and the man was too scared to put the harness on the mule, and I remember putting the harness on the mule and tying the hame-string and we went down to the car and pulled the car off. I was scared not to do anything at the time. If I had known the gun did not have a shell in it, I believe I would have run, I believe I would have swum the Chattahoochee River. We tried to pull the car, and the chain pulled loose a few times, and we finally got the chain to where it would stay tied, and pulled it off. I was leading the mule, and when we got it

cranked and got it unhooked I figured, well if I can lead the mule back towards the barn maybe he will drive off and forget about me, but he didn't. He says, 'You get back in here,' and made me get back in the car. After we got started we went on up and crossed the river, I don't know how far, just a short little ways, and this car tore up and stopped right in the middle of the road or about in the middle of the road, and he made me get out. I was standing there. I don't know just what was said—something. He says, 'You know too much,' and hit me with the gun. Well, I kinder back over—I don't know. I though there was a bank on the side of the road, and I was standing right near the edge of that bank, and he knocked me down that bank. Then he hit me in the stomach and knocked me down the bank, and he says, 'Fellow, don't you look up.' And I says, 'I haven't done a thing in the world to you.' And he says, 'Dead men don't talk,' and hit me across the head with the pistol, and I seen I had to fight or be killed. I figured that his intention was to kill me, that he figured if he couldn't do away with me I would get somebody and tell them; he kept beating me across the head. I struck at him, but I wasn't no man for him, and I seen I couldn't tussle with him, and he comes on top of me; and wherever the sheriff found me, that is where I was. This knife Mr. Lathem said I had a knife in my hand—that must have been put in my hand. If I had had that knife in my hand open I would have tried to use that knife. I would have really tried to defend myself when I thought that man was trying to kill me. I believe anybody would. That knife was surely put in my hand. I don't know who done it or the one done it, although I heard Mr. Lathem state the knife was open. I would have defended myself with that thing if I had had it in my hand. I would have tried it, wherever they found me; it was there close. That is all I know until I kinder come to in jail."

The motion for a new trial contained the general grounds and several special grounds added by amendment. The following rulings, unless otherwise indicated, will refer to the grounds as they appear in the amendment.

■ The judge charged the jury as follows: "Before you would be authorized to convict upon circumstantial evidence alone, the proven facts must not only be consistent with the hypothesis of guilt but they must exclude every other reasonable hypothesis save

that of the guilt of the accused. And the term 'hypothesis' as used in that connection means such reasonable inferences or such reasonable deductions as an ordinarily prudent man would make in the light of his every-day experience or in the light of his knowledge of human conduct and human behavior."

In ground 1 the movant criticised this charge as containing an incorrect definition of "hypothesis," and asserted that it was confusing and misleading and "caused the verdict against movant."

In *White* v. *State,* 18 *Ga. App.* 214 (89 S. E. 175), it was stated that the term "hypothesis," as used in the section of the Code relating to circumstantial evidence (§ 38-109), referred to "such reasonable inferences as are ordinarily drawn by ordinary men in the light of their experience in everyday life." This statement was approved in *Wrisper* v. *State,* 193 *Ga.* 157, 164 (17 S. E. 2d, 714). The foregoing charge was in substantial accord, and was not erroneous as applied to the word in its legal setting. There is no merit in this ground.

■ In ground 2 the movant complained of the following charge: "It is insisted by the State in this case that certain statements were made in the presence and hearing of the defendant as to who committed or how the offense charged was committed and how it was done, and that he failed to make any answer or any denial under conditions or under circumstances that required an answer by him. Now on that the court charges you that acquiescence or silence when the circumstances require an answer or a denial by the defendant, or other conduct, may amount to an admission by the defendant. It is the duty of the jury to see whether or not the statements were made in the presence and hearing of the defendant, and whether or not the circumstances were such as to require an answer or a denial by the defendant. If you find that they were made in his presence and hearing, and that the circumstances were such that an answer or a denial was required, and he made none, then you would be authorized to treat such statement as an admission by the defendant."

The exceptions to this charge were as follows: (a) the charge was an argument for the State made by the judge, though not so intended; (b) it intimated an opinion by the court that such statements had been made and had not been denied; (c) the court did not charge in this connection that the defendant's failure to deny

such statements must be free from fear of punishment or hope of reward before his silence could be considered as an admission, because when statements are made in his presence in the jail, and in the presence of officers and the said Emmett, silence because of fear of punishment would not be an admission on his part; (d) because said charge was prejudicial to movant and caused verdict against him.

The excerpt was a substantially correct statement of the law, and was not subject to any of the exceptions taken. Code, § 38-409; *Wright* v. *Stale,* 136 *Ga.* 130 (2) (70 S. E. 1102); *Emmett* v. *State,* supra. It is not a good assignment of error on a portion of a judge's charge which states a correct principle of law applicable to the case, that some other correct and applicable instruction was not given. *Jester* v. *State,* 193 *Ga.* 202 (2). (17 S. E. 2d, 736).

■ The judge gave to the jury the following charge in reference to flight: "Now it is another contention of the State that after the commission of the alleged offense, that the defendant fled and concealed himself; and I will give you this rule which you will apply to that contention: Flight, if any, and similar acts, if proven, from which an inference of guilt may be drawn may be considered by the jury, but flight, if any, is subject to explanation. The weight to be given to it and whether the jury will draw a consciousness of guilt or not is a question for the jury. It is for the jury to determine whether the flight of the defendant, if any has been shown, was due to a sense of guilt or for other reasons; and if for other reasons, then no inference hurtful or harmful to the defendant should be drawn by the jury."

In ground 3 it is contended that this charge was erroneous, because: (a) said charge was in effect an argument for the State, though unintentional; (b) there was no evidence to authorize the charge on flight; (c) said charge on flight added "and similar acts," and thus mixed the law of flight with other acts; (d) said charge, though unintended by the court to do so, placed before the jury as a major factor flight to show guilt, when there was no evidence to authorize the charge on flight, and when, as a matter of fact, merely going away from the place where the crime has been committed, and not leaving the State or concealing himself, is no evidence of guilt and should not be considered or charged on as evidence of guilt.

The charge was not erroneous, as contended, on the ground that it was not supported by the evidence. Lee Lathem, a witness for the State, testified:

"I am the one who found Kalb. I imagine he was about a half a mile or a little more from the home where Guy McConnell lived. The car was stopped about a half a mile or a little more from McConnell's, I imagine, on the road. It was very near the center of the road. . . I found him in a brush pile about eighty steps, I guess, from the road. I had not been hunting for him very long before I found him. . . I found Kalb in another county, Forsyth County. About a half a mile, I imagine it might be a little more than that, from where Mr. McConnell lived. I think the river is the line between Hall and Forsyth County, and it is not very far on the other side of the river. . . Kalb had this knife on him when I found him. He had it in his hand. It was open. That blade right there was open. There was no blood on the knife. He was pretty badly beat up when I found him. His head was beat up. Most of the wounds were on top of his head, and he was kinder bloody in the face. I think he had a few scratches on his face. I couldn't be positive about his being wounded there where that scar is up there—up here seemed to be cut—wounds on the top of his head. The wounds were breaks. I don't know whether they were in the skull. In the skin or scalp, like he had been struck with something, some weapon or something. I did not think it could have been done with fists, something heavier than a man's fist. He was sort of lying on his back—lying on his right side in a brush pile. I just happened up on him. If somebody said he was down there about a dead pine, I wasn't the person they told it to. Kalb told me his name. He did not make any effort to conceal his name. I did not see his registration card, I think somebody found that later. I did not find it at the place where I found him. I did not see it. I just heard it was brought to the office. I haven't seen it. He didn't make any statement to me about where he got the knife. He made a statement to me about how come him in that condition and who beat him up. Said Emmett beat him up with a pistol. He didn't say why. I do not know what doctor waited on him after I brought him in. I went on back. I believe that is about all I know about this."

Cliff Jenkins testified, that he was at the home of McConnell when the defendants left that afternoon; that Emmett was driving the automobile; and that Kalb went away with him. He also testified as to threats that were made against him (the witness) by Emmett, and that Kalb could hear all that was going on most of the time. When they were trying to get the automobile started, Emmett told Kalb to stop telling the witness what to do; that he, Emmett, was the man that was giving the orders; that Kalb then hushed, but the witness did not know whether it frightened him or not. The witness further testified that Kalb looked like he had a cut place "or little gash" in his chin, "looked like a little splotch of blood."

While the jury might have been authorized to find that Kalb left the place of the alleged crime for reasons other than a consciousness of guilt, the evidence presented an issue as to this matter. The use of the words "similar acts" in the charge on flight was not harmful, even if erroneous. See, in this connection, *Dean* v. *State,* 154 *Ga.* 533 (2) (114 S. E. 809); *Luke* v. *State,* 183 *Ga.* 302 (3) (188 S. E. 542); *Wilson* v. *State,* 190 *Ga.* 824, 830 (6) (10 S. E. 2d, 861). Nor was the charge argumentative, as insisted.

■ In ground 9 the defendant complained of the admission of testimony of R. G. McConnell, R. G. McConnell Jr., and Sheriff A. W. Bell as to statements made by the deceased and offered by the State as dying declarations. Each of these witnesses testified regarding a statement made by the deceased at the hospital on the night of January 29, a few hours after he was injured; and R. G. McConnell Jr. testified regarding a second statement, made to him alone on the following night.

The testimony of A. W. Bell was as follows: "I asked him did he realize the condition he was in. His reply was that he did. I mean he just says, 'I am killed,' or 'nearly killed,' or something like that, and says, 'They robbed me,' and I believe 'They robbed me and killed' or 'nearly killed me' is the first words he said there. I asked him did he know who, and he said 'They done it,' and I asked him who they was, and then he replied, 'Emmett did it.' He said, 'He hit me with a pistol.' As I remember the words he said, 'Emmett hit me one, and then I handed him my money, and he hit me again.' He said, 'I handed it [his pistol] to them.'

I asked him where he got it, and he said out of a . . kind of closet in the wall. He asked him to see the pistol, and when he handed it to them he struck him with it after he handed it to him. I stayed there for some time when he was making that statement, but he did not stay in a conscious condition but a mighty few minutes—in other words, he was talking when he went out, and he never did regain—I mean by 'went out' that he lapsed back unconscious, and I thought he was dying for some minutes after that time. Mr. Guy McConnell said that Emmett was the one who hit him. The only thing he said, 'they done it,' and always referred to Kalb as the other man; he never called Kalb's name. He never did charge that the other man hit him. I was not present at the scene. I do not know anything about what happened down there. Mr. McConnell never did tell me either one of them hit him with the shotgun. McConnell never did say he was hit with anything except the pistol—'they hit me with the pistol.'"

We do not state the evidence of the other witnesses, since we are of the opinion that there was no error in admitting the testimony of Bell; and this ruling will be controlling as to the evidence of the other witnesses.

The evidence was objected to on the grounds: (a) that it was hearsay and prejudicial; (b) that it was not shown that the declarant was in a dying condition, because he did not die for more than three months after the declarations were made; (c) that the declarant was not conscious of being in a dying condition; and that it was not shown that he was rational, and "it did not appear that he finished the conversation before becoming unconscious."

All three of the witnesses testified as to the condition of the deceased at the time the statement or statements were made by him, and the extent and nature of his wounds were described by physicians. The evidence as a whole was sufficient to show prima facie that the deceased was in the article of death and conscious of his condition at the time the declarations were made; and the evidence regarding them was properly admitted, so far as preliminary foundation was concerned. The case is unlike *Mitchell* v. *State*, 71 *Ga.* 128, where the admissibility of the declarations depended on a combination of circumstances which is not found in the instant case.

The rulings made in Emmett's case as to similar evidence would seem to be controlling, except that some further observations should be made in view of the contention here that the declarant did not "finish the conversation before becoming unconscious," and the testimony of Sheriff Bell that "he did not stay in a conscious condition but a mighty few minutes—in other words he was talking when he went out, and he never did regain—I mean by 'went out' that he lapsed back unconscious, and I thought he was dying for some minutes after that time."

This evidence is somewhat different from any that was given in Emmett's case, and requires further consideration on the question of incompleteness. "If a dying person finishes the statement he wishes to make, it is no objection to its admissibility as a dying declaration that he told only a portion of what he might have been able to tell. A distinct statement of facts meets the requirement of completeness, if it does not appear that the statement was intended to be connected with or qualified by another statement, notwithstanding the statement does not cover all matters which must be proved to convict upon a charge of homicide." 26 Am. Jur. 435, § 400. "A dying declaration which was uncompleted because the declarant became unconscious before finishing his statement is not thereby rendered inadmissible. . . But if it appears that the statement was intended by the declarant to be connected with and qualified by other statements which from any cause he was prevented from making, it should be excluded as fragmentary and incomplete." 30 C. J. 277, § 516. The texts here quoted are well supported, and fully cover the present inquiry. McLean v. State, 16 Ala. 672; State v. Patterson, 45 Vt. 308 (12 Am. R. 200); State v. Brinkley, 183 N. C. 720 (110 S. E. 783); State v. Collins, 189 N. C. 15 (126 S. E. 98); Worthington v. Maryland, 92 Md. 222 (43 Atl. 355, 56 L. R. A. 353, 428, note); Daughters v. Kentucky, 255 Ky. 172 (73 S. W. 2d, 10, 94 A. L. R. 673, 679, note). In the instant case, it does not appear that the statement of the deceased was intended to be qualified by anything else that he might have said if he had not lapsed into unconsciousness, and was not inadmissible for incompleteness. This ruling will apply not only to the evidence of Sheriff Bell, but also to the similar evidence of the other witnesses.

■ In ground 4 it was contended that the court erred in giving the following charge in reference to dying declarations: "To ren-

der admissible dying declarations as to the cause of his death and the person who killed him, they must be made by the declarant in the article of death, and he must be conscious of his condition. Consciousness on the part of the deceased that he was dying and was in extremis may be inferred not only from his statement but also from the nature of the wound and from other circumstances. The actual period of survival after making the declaration is not controlling; the question does not depend on the length of time between the declaration and the death of the declarant, but upon the declarant's mind at the time the declaration is made and his belief that he was then in a dying condition."

The charge was assigned as error upon the following grounds: (a) There was no evidence to authorize a charge on dying declarations; (b) said charge was an argument in favor of the State, though unintentional on the part of the judge; (c) said charge unintentionally intimated and expressed opinion of the court that there had been dying declarations and that deceased was in a dying condition, though he did not die for months afterwards; (d) the statement, 'The actual period of survival after making the declaration is not controlling,' caused prejudice against movant by leaving the jury to disregard considering the lapse of months between the making of the declaration and the death of the deceased; (e) in this connection the court did not charge the jury that it was for them to be satisfied the declarant was then intelligent and in his right mind long enough to complete whatever statement he started to make as a dying declaration before becoming unconscious and stopping the declaration. There was no merit in any of these exceptions. While the lapse of a long period of time between the making of the declaration and the event of death may within itself constitute some evidence that the declarant had not despaired of recovery, it is nevertheless true, as was stated in the charge, that the actual period of survival after making the declaration is not controlling. If further instructions were desired, they should have been requested. *Emmett* v. *State,* supra.

■ In ground 5 the movant complained of the following charge: "If there was a plan or scheme, or an agreement between the defendant now on trial and Thomas Emmett, and if you find that there was such a plan and scheme, and the evidence shows that beyond a reasonable doubt, for them to rob Mr. McConnell, but if

during the perpetration of the commission of a robbery you find that any person acting with the defendant now on trial in furtherance of the plan or scheme to rob Mr. McConnell killed Mr. McConnell, then I charge you that this defendant would be guilty of the offense of murder even though there was no original plan, or no original agreement, to kill him. But if there was a plan to rob him between this defendant and Thomas Emmett, and if in the perpetration or the commission of that robbery Mr. McConnell was killed by Thomas Emmett, then I charge you this defendant would be guilty of the offense of murder."

The charge was alleged to be erroneous for the following reasons: (a) There was no evidence to authorize it; (b) it is contrary to law, in that a conspiracy to rob is not a conspiracy to murder; (c) it charges that movant would be guilty of murder by conspiring to rob, where there was no conspiracy to murder, and where murder would be outside the scope and necessarily outside of the conspiracy; (d) it makes one liable for the act done by another when there is no conspiracy or unity of action on the part of that other person with movant; (e) it was prejudicial and caused the verdict against movant.

In *Berryhill* v. *State,* 151 *Ga.* 416 (107 S. E. 158), it was held: "Where two or more persons conspire to rob another who is employed in a building, and one of the conspirators keeps watch or guard at a convenient distance while the others enter the building and, in furtherance of the common design to rob, kill the person intended to be robbed, such killing is a probable consequence of the unlawful design to rob, and all the conspirators are guilty of murder, including the one on guard." The ruling thus made has been followed in several later decisions, and the charge here assailed was in substantial accord therewith. *Gore* v. *State,* 162 *Ga.* 267 (134 S. E. 36) ; *Simpson* v. *State,* 168 *Ga.* 598 (148 S. E. 511) ; *Simmons* v. *State,* 181 *Ga.* 761 (184 S. E. 291) ; *Jenkins* v. *State,* 190 *Ga.* 556 (9 S. E. 2d, 909). The charge was authorized by the evidence, and was not otherwise erroneous as contended.

■ In ground 6 it was contended that the court erred in charging the jury that if they should find the defendant guilty, but did not desire that the death penalty be inflicted, they "could" go further and recommend him to the mercy of the court; the errors assigned being that the court improperly used the word "could"

instead of "should," and also that the jury were not told in this excerpt that they need not have any reason or cause for such recommendation, beyond a mere desire or wish to that effect on their part. Since the jury as a matter of fact did recommend the defendant to the mercy of the court, even if the charge may have been erroneous it did not hurt the defendant, and he can not complain.

In ground 7 it was averred that after the jury had retired and considered their verdict for some time, they came into court and asked for additional instructions, when the following occurred: The court: "Gentlemen, you say you desire some additional instructions?" Foreman: "Your Honor, Judge, there is some of the jury doesn't understand exactly what kind of verdict that we could make—we would just like a recharge." The court: "On the form of your verdict?" Foreman: "Beg pardon?" The court: "On the form of your verdict?" Foreman: "Yes, sir, and the sentence that could be—" The court: "All right. Gentlemen of the jury, in the event you convict the defendant of the offense of murder, the form of your verdict would be: 'We, the jury, find the defendant guilty.' Now that would mean that you find him guilty of murder, and the punishment for murder is death if you should render a verdict, 'We, the jury, find the defendant guilty,' and stop there; then the punishment would be death. In the event you convict of murder, and for any reason, or the absence of any reason, or for any reason satisfactory to yourselves you do not desire that the death punishment be inflicted, then you could add to your verdict: 'and we recommend him to the mercy of the court,' and the court would construe such recommendation as a recommendation that he be required to serve the remainder of his natural life in the penitentiary. In the event you do not convict of murder; in other words, if the evidence does not authorize his conviction of murder, or if you entertain and have a reasonable doubt as to his guilt of murder, then you should acquit him, and the form of your verdict would be: 'We, the jury, find the defendant not guilty.' I have only submitted to you the offense of murder either with or without a recommendation, or you should acquit; and those are the forms—murder is the only offense submitted to you. Now does that cover what you wanted?" Foreman: "Well, we did not know whether our verdict could be for anything less than murder." The court: "No sir, it could

not—it would either be a conviction for murder or an acquittal; but if you should convict of murder, you could recommend mercy if you see proper to do so. Now does that cover your request?" Foreman: "Yes sir." The court: "All right, you may retire."

Movant contended that said charge was error for the following reasons: (a) though unintentional on the part of the judge, he expressed and intimated the opinion that movant was guilty of murder; (b) said charge and conversation discouraged the jury in their not wanting to convict the defendant of murder, and discouraged them in not wanting to give movant a life sentence, and caused the verdict against movant; (c) said charge and the emphasis on murder and nothing else so expressed the opinion of the court, though unintentional on the part of the court, that the jury felt impelled to find the verdict against movant or be out of good standing or free from reprimand of the court.

Under the evidence and the defendant's statement, there was no intermediate offense, and the judge properly stated that "it would either be a conviction for murder or an acquittal; but if you should convict of murder, you could recommend mercy if you see proper to do so." The charge did not contain an expression of opinion by the judge, and was not otherwise erroneous, as insisted.

■ In ground 10 the movant averred that the following testimony of Dr. Lee Rogers was elicited by the judge and allowed to remain before the jury: The court: Q. "Was he ever entirely normal after he came to the hospital?" A. "No sir." The court: Q. "Ever apparently fully rational?" A. "Well, at times he would talk to me about things that had passed years ago —of course he had no way of knowing where he was—he did not remember where he was, and did not know who he was half the time, and he talked about something that happened, say, thirty or forty years ago; but as far as having any logical conversation about the present he did not have that at all." The court: Q. "Did he say anything about a robbery?" A. "Well, he had several of these bad spells, and he would get excited and get frightened, and he would call for help once or twice, and there was a closet in the room, and he would run in there and pull the door to, and tell them to 'keep those robbers away from me, as they are killing me'—he did that a number of times." Recross-examination by Mr. Johnson: Q. "He was not rational when he did that?" A. "No sir."

The complaint made was as follows: "Movant contends that allowing the above evidence to be introduced, and especially the court eliciting the above evidence when it had not been introduced before, and permitting said evidence to remain before the jury, was error and was greatly prejudicial to movant and contrary to law, and caused the verdict against him, in that the evidence shows that the declarant was unconscious and wholly irrational and did not know what he was saying and would be wholly incompetent as a witness. Movant further contends that the question by the court asking if anything was said about a robbery was error and prejudicial, because no case of robbery was being tried, and the question had the effect of intimating and expressing an opinion on the part of the court that there was a robbery. Movant contends that matter so prejudicial and harmful should have been ruled out on the part of the court of its own motion, and the jury should have been instructed by the court to disregard it wholly, in the interest of fairness to the accused."

There is no merit in the contention as to expression of opinion by the judge; nor does this ground otherwise show error, it not appearing that there was any objection to the testimony, or that any ruling or other action was invoked.

Ground 8 was a mere elaboration of the general grounds. The evidence authorized the verdict, and the court did not err in refusing a new trial.

*Judgment affirmed.* *All the Justices concur.*