## 32259. THOMAS v. THE STATE.

HALL, Justice.

Joseph Thomas, appellant here, and one Ivon Stanley murdered Clifford Floyd on April 12, 1976, by shooting and beating him savagely and burying him alive. Thomas was tried separately and was convicted of murder, armed robbery and kidnapping with bodily injury, receiving three death sentences. This is his appeal and mandatory review of the death penalty. We have affirmed Stanley's conviction and two death sentences in *Stanley v. State,* 240 Ga. 341 (1977).

I. Summary of the Evidence

On April 12, 1976, Clifford Floyd, the victim, was making his regular Monday afternoon rounds through the Fowlstown area of Bainbridge, Georgia, collecting weekly insurance premiums. Five weeks earlier Thomas

and Stanley had been overheard talking about robbing the insurance man because they needed some money. About one month prior to the murder they were again overheard by a different person discussing the planned robbery. The two agreed that after the robbery they would "have to get rid of him because he will tell who we are." Subsequent events are described from Thomas' statements.

On April 12 Floyd came by Thomas' house to collect a premium. When he left, Thomas sent a friend over to Stanley's house "to tell Ivon to come over to my house." Stanley "came straight on over. And I told him, I asked him, I said 'you can get the insurance man if you want him. . . .'" Stanley ran from Thomas' house and caught up with Floyd. On a pretext he persuaded Floyd to return to the Thomas residence. Stanley was armed with a .22 caliber pistol which Thomas had just given him. When Thomas came out of the house Stanley had already pulled the gun on Floyd, emptied his pockets and told him not to move and not to say anything. Stanley, armed with the pistol, and Thomas, carrying a hammer, forced Floyd to go with them to the woods near the Thomas house. As they were walking, Floyd and Thomas exchanged some words. Angered, Thomas struck Floyd on the forehead with the hammer. Thomas walked back up to the hog pens near his house, got a length of rope, and returned to the woods where the other two were. Again leaving Stanley and Floyd alone, Thomas went back to where Floyd had parked his car and drove it away in search of a hiding place. He rifled the car, broke into the glove compartment and removed a .22 caliber pistol. Leaving the car he walked back to where he had left the other two men.

When Thomas returned, he found Floyd tied to a tree. Stanley said, "You know, you know, we gonna have to, you know he knows." Thomas responded, "Yeah." "You know, we are gonna have to get rid of him," said Stanley. Thomas said nothing, then went back to his house, got his mother's shovel and returned.

With the shovel, Thomas began digging a shallow grave perhaps 11 inches in depth. Tiring, he gave the shovel to Stanley who finished "digging that insurance man's grave."

When they had completed the grave, Stanley went over and untied Floyd from the tree but left his hands bound. Considerable blood was flowing from Floyd's forehead. Thomas ripped part of the shirt from the man's back and stuffed it into his mouth to silence him. As they approached the grave, Stanley handed the gun to Thomas and told him, "You gonna do the rest. . ."

Taking the gun, Thomas turned his head away and fired five times at Floyd's head. Stanley then took the shovel that had been used to dig the grave and hit Floyd with it twice. He handed the shovel to Thomas who beat the man with the shovel. He hit him once in the stomach, twice in the head and one time in the chest. Floyd was still alive. Stanley then began to shovel dirt over the lower part of Floyd's body. When he had partially buried the man, he handed the shovel to Thomas who then began to shovel dirt over Floyd's head. Through all of this, Floyd was not only struggling for breath but, as the dirt began to cover his head, he attempted to say something. Twice, according to Thomas, the insurance man had pleaded for his life.

When Floyd, still breathing, was completely covered in his shallow grave, the two men left, Thomas returning to his home. At around 6 p.m., as Thomas was finishing supper, Stanley came over to his house and said that they had "[b]etter go move that car." They drove the car down an old logging road where they eventually bogged down. The car was ultimately discovered by law enforcement officials.

At the time of Floyd's last known collection he would have collected approximately $234.

Beginning the next day, four anonymous telephone calls were made to police telling them where they could find the car and giving misleading information about the victim. Through a telephone tap, one of these calls was traced to Thomas' home. When police arrived, he was the only one at home. He subsequently admitted making the call.

An autopsy, performed by James Dawson, Assistant Director of the Georgia Crime Laboratory, disclosed a gunshot wound through the victim's upper lip; numerous lacerations to the scalp, head, and body, apparently

inflicted by the leading edge of a shovel; a depressed skull fracture pushed into the brain consistent with a blow from a hammer; brain hemorrhage; a broken sternum; and "a rather striking accumulation of both blood and dirt which was found in the bronchi of both lungs, scattered up and down the trachea and in the larynx and also in the upper-most part of the stomach. . ." Based upon the autopsy, death was caused by swallowing a mixture of blood and dirt, vomiting it up, then inhaling the regurgitated mixture into the lungs. In sum, Clifford Floyd either strangled or suffocated on his own blood within about thirty minutes as he lay buried in the shallow grave.

Thomas was arrested two days after the murder and confessed in intricate detail to this crime. His confession was tape-recorded seven days after the murder and was introduced at the trial. He took the stand and testified that he had no memory of the incident after ingesting two pills given or sold to him by "some dude" in Macon. He also claimed no memory of the telephone calls or of the confession given seven days later.

## II. Enumerations of Error

1. In his first enumeration of error, Thomas alleges: "The trial court erred in denying the defendant funds with which to hire experts for use in his trial. . ." He contends that he requested (a) an electronics expert, (b) a forensic pathologist, (c) a drug analysis expert and (d) a psychiatrist.

"The granting or denial of a motion for appointment of expert witnesses lies within the sound discretion of the trial court. Unless there has been an abuse of discretion, the trial court's ruling will be upheld." *Patterson v. State,* 239 Ga. 409, 412 (238 SE2d 2) (1977). Accord, *Welch v. State,* 237 Ga. 665, 672 (229 SE2d 390) (1976); *Holsey v. State,* 235 Ga. 270 (3) (219 SE2d 374) (1975).

(a) The record does not show that Thomas ever moved the trial court to appoint or pay for an electronics expert to examine his taped confession, though there was a brief discussion of a continuance for his counsel to seek to obtain such an expert. Accordingly, the enumeration of error on this point is groundless.

(b) Thomas' claim that he needed a forensic

pathologist to assist him in understanding the autopsy report by Dr. Dawson, of the state crime laboratory, is hard for this court to comprehend. The defense does not deny that Floyd was brutally murdered, nor do they deny that Thomas murdered him: the sole defense is the two pills Thomas testified he swallowed before the killing. What was there to understand about this autopsy report on the victim? Mr. Farmer was asked this question on oral argument in this court, and gave no satisfactory answer.

There is no indication of any information possessed by the state crime laboratory that was not furnished to Thomas' counsel. As a matter of fact at his committal hearing his trial counsel stated that she knew "fully what the doctor has testified to [concerning the autopsy]."

Dr. Dawson was qualified as an expert at the trial; testified fully; and was cross examined by Thomas' counsel. No error on Dr. Dawson's part has been shown, and no need for appointment of a forensic pathologist for Thomas has been shown. The enumeration of error on this point is without merit.

(c) Thomas filed a pre-trial motion for a drug analyst. The stated basis for this request was for the expert to "examine drug samples belonging to the defendant." Thomas alleged that he obtained four pills of unknown chemical content and ingested two of these before the offense and hid the other two in his house. However, he was given every opportunity to produce these pills and he always came up empty-handed. His counsel made no effort to search for the two remaining pills until the trial was in progress. The court then ordered a search and when it was unsuccessful, ordered another. The second search of the house *with Thomas present to assist* failed to produce the pills. In short, there were simply no drugs for a drug analyst to analyze, and the enumeration on this point is without merit.

In any event, Dr. Bosch, the state's examining psychiatrist, testified that it was possible for a drug to "overmaster [a] person's will or impel him to commit a crime." This was about as favorable as any testimony Thomas could hope for from his own drug analyst. No error has been shown.

(d) Finally, Thomas made a pre-trial motion for a psychiatric examination. The trial court ordered that he be transferred to Central State Hospital for psychiatric observation and evaluation. Once there, he refused to discuss the crime with the examining psychiatrist. According to Dr. Bosch, Thomas was mentally competent at the time of the evaluation and was able to assist with the preparation of his defense. Concerning his mental condition at the time of the offense, Dr. Bosch was asked "whether or not it is possible psychiatrically to determine with mathematical certainty" what a person's mental condition had been months earlier. He responded that there was no way that could be done.

Thomas did not challenge the qualifications of Dr. Bosch and does not indicate how an evaluation by another psychiatrist would have differed from Dr. Bosch's.

It is important to remember that a psychiatrist appointed by the court, as Dr. Bosch was, is an expert for the court. *Massey v. State,* 226 Ga. 703, 704 (177 SE2d 79) (1970). Having been given the opportunity for the psychiatric evaluation he asked for, Thomas then refused to discuss the facts of the crime with Dr. Bosch. His contention on appeal is nebulous, but appears to be that the state should have paid for him to be evaluated by another psychiatrist satisfactory to him. The contention is without merit.

*Patterson v. State,* 238 Ga. 204 (232 SE2d 233) (1977), relied on by Thomas, does not support his position in any particular. Enumeration 1 is without merit.

2. In Enumeration 2, Thomas alleges: "The trial court erred in admitting the tape recorded statement alleged to have been made by Thomas because there was no proper foundation in that the tape had been intentionally altered and had unexplained stops and starts, fade outs, and gaps . . ." In Enumeration 3 he objects to the admission of the transcript of the tape recorded statement, alleging that it is not a true transcription of the tape and that it is secondary evidence.

The trial judge listened to the tape recording in camera prior to playing it before the jury. Concerning an attempted "correction" of the tape to change the misstated

date "January 12" to "April 12," the judge found the initial mistake to have been a slip of the tongue, harmless to Thomas and not misunderstood by anyone. The fade of a few words and their "return" on subsequent replay is understandable. The court found that the fade did not exist when the tape was originally transcribed, and when the words "reappeared" they were as they had been originally. Stops and starts were explained by visitors and calls to the sheriff that interrupted the interrogation, and transcription of "you" in place of "who" (obviously a phonetic problem) was meaningless and harmless to Thomas. All deficiencies in the tape were explained to the satisfaction of the trial judge. Under our decision in *Harris v. State,* 237 Ga. 718 (230 SE2d 1) (1976) the fact that a tape is not flawless does not mean that it is inadmissible.

Enumeration 3, attacking the accuracy of the transcription, is similarly not meritorious. The trial court called upon the court reporter to put into the record any variation between the tape and the transcript. Upon Thomas' counsel's objection, this witness did not testify. However, we have reviewed these variations and find them to be infrequent, random, and totally insignificant. No valid reason was shown for excluding the transcription of the tape - recorded confession.

Neither the transcript nor the tape recording was sent out with the jury. As a matter of fact, when they requested it, it was withheld upon Thomas' objection. *Walker v. State,* 215 Ga. 128 (109 SE2d 748) (1959), relied on by Thomas, has no application here inasmuch as *Walker* held that it was error to send a written confession out with the jury over a timely objection.

3. In Enumeration 4 Thomas alleges "The trial court erred in reading from the alleged transcript of the tape recording of a statement alleged to have been made by Thomas, and questioning a witness concerning the contents of the statement in a manner casting disbelief upon the defendant before the tape had been so much as tendered by the prosecution and before any hearing was held as to its admissibility, . . ."

The trial court did not question the witness concerning the transcript of the statement until he had

determined that the prosecution anticipated using it. The issue at that point was the existence of and search for the two elusive pills. Both the prosecution and the defense had touched upon the matter in examining the witness and the court had already held an in camera hearing on the admissibility of the tape and the transcript. The court's questions concerned the existence of the pills and the sheriff's efforts at locating them. This occurred after the court had agreed to arrange a second search for the pills at Thomas' request.

Code Ann. § 81-1104 prohibits a judge from expressing or intimating his opinion as to what has or has not been proved. This court quoted with approval from an earlier case as follows: " 'The trial judge has the right to propound a question or a series of questions to any witness for the purpose of developing fully the truth of the case; and the extent to which the examination conducted by the court shall go is a matter within his discretion. And a lengthy examination by the court of a witness called by either party will not be cause for a new trial, even though some of the questions propounded by the court were leading in character, unless the court, during the examination of the witness by himself, expresses or intimates an opinion on the facts of the case, or as to what has or has not been proved, or the examination takes such course as to become argumentative in character.' *Gillis v. Bowman,* 132 Ga. 762 (1) (64 SE 1096); *Marcus v. State,* 149 Ga. 209 (6) (99 SE 614); *Johnson v. State,* 169 Ga. 814 (2) (152 SE 76); *Cobb v. State,* 185 Ga. 462 (2) (195 SE 758); *Kalb v. State,* 195 Ga. 544 (25 SE2d 24)." *Wilson v. State,* 229 Ga. 224 (2) (190 SE2d 78) (1972). See also *Ezzard v. State,* 229 Ga. 465 (192 SE2d 374) (1972).

So tested, the questions propounded by the trial judge were not improper. The record does not support Thomas' claim that the trial court acted out of ill will for him, and Enumeration 4 is without merit.

4. In Enumeration 5 Thomas alleges: "The trial court erred in interrupting defense counsel's examination of witnesses and questioning witnesses himself in a way which was argumentative in nature and which intimated and expressed an opinion unfavorable to the accused and counsel on the facts of the case in violation of ... Ga. Code §

81-1104 . . . [and the Constitution]."

We have examined each instance pointed out where the trial court examined a witness, and we find no improper expression or intimation of his opinion as to what had or had not been proved, or as to the guilt of the accused, when measured with the standard set forth in addressing Enumeration 4 above.

Thomas alleges with respect to the sentencing phase of trial that the trial court impeded proof of mitigating circumstances by failure to instruct that one possible mitigating circumstance could be that "At the time of the murder, the capacity of the defendant to appreciate the criminality [wrongfulness] of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect or intoxication."

There was no evidence of intoxication and the jury had decided the issue of mental disease or defect adversely to Thomas on the guilt phase of trial and still had that evidence before them. They were instructed to consider mitigating circumstances, but none were singled out by the court, and they are not required to be singled out under Georgia law (see Code Ann. § 26-3102). Mitigating circumstances are not a predicate for a recommendation of a life sentence, though statutory aggravating circumstances are required for a death sentence. At the appropriate place on the trial judge's report the judge did indicate that there was no evidence the defendant was under the influence of narcotics or dangerous drugs at the time of the offense, and he went on to explain that there was "No clear evidence of use of any drugs affecting the conduct of defendant. Evidence suggested took two pills of unidentifiable nature some considerable time before the crime." This accords with the testimony at trial.

In any event, the trial judge's report is an administrative convenience for this court, and nothing a trial judge enters thereon is ever seen by the jury.

Enumeration 5 is without merit.

5. The issues sought to be presented in Thomas' Enumeration 6 will be discussed below in our sentence review.

6. Enumeration 7 alleges error in the following occurrence: During the jury's deliberation on the

sentence, they returned to the courtroom and the foreman asked: ". . . we would like to know if the defendant, Joseph Thomas, gave [sic] a verdict of life imprisonment, how long would the defendant have to serve? Would that be life or would he be eligible for parole?" The Court: "I'm not permitted to comment on that at all." This occurred in open court and defense counsel made no objection.

Thomas relies on *McGruder v. State,* 213 Ga. 259, 265 (98 SE2d 564) (1957) in support of his position that this exchange constituted an improper suggestion by the court that parole for defendant was a possibility. The trial court's flat refusal to comment is not what was found erroneous in *McGruder* and subsequently in other cases such as *McKuhen v. State,* 216 Ga. 172 (115 SE2d 330) (1960). No error occurred in this open court exchange. Cf. *Berryhill v. State,* 235 Ga. 549 (221 SE2d 185) (1975).

Enumeration 7 is without merit.

7. In Enumeration 8, Thomas alleges: "The sentence of death should be reversed because of the district attorney's improper argument to the jury during the penalty phase of the trial. . ."

At one point in the district attorney's statement to the jury in the closing argument in the punishment phase of the trial he said, "And don't let anybody make you feel like you are responsible. The laws of the State of Georgia provide that under certain circumstances the death penalty is authorized, and if you find those circumstances to exist as they exist in this case, the state submits to you that you have no choice if you are going to follow the law." Defense attorneys made no objection at trial to this argument; but they contend here that the jury were thus erroneously told that they had no power under the law to recommend a life sentence if one of the aggravating circumstances was present. The state argues on appeal that the district attorney's statement should be read to mean that on the facts as presented death was the only reasonable punishment. In this regard we will consider "Whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor." Code Ann. § 27-2537 (c) (1).

At the outset of the trial the trial court charged the jury:

"I warn you that you are not bound by what any attorney during the trial says are the facts or the law. You take the facts from the witnesses and other evidence presented in the case and the law from the court as given to you in the charge, and as may be pronounced during the trial and by applying one with the other, make judgment as to the truth of the case."

They were again charged at the conclusion of the guilt or innocence phase of the trial that "the law you will take from the court" and "The charge of the court is the law of the case."

At the conclusion of the sentencing phase of the trial (after the district attorney's argument), the trial court three separate times charged:

"If you find beyond a reasonable doubt that the state has proved the existence in this case of either one or more of the aggravated circumstances, as contended for by the state and as given you in charge by the court, then you would be authorized to recommend the imposition of sentence by death. But you would not be required to do so.

"If you find beyond a reasonable doubt that the state has proved the existence in this case of one or more of the aggravated circumstances contended for by the state and given you in charge by the court, you would be also authorized to recommend the defendant to the mercy of the court. Which is a recommendation you may make either with or without reason. You may make it for any reason that is satisfactory to you or without a reason. You may make it arbitrarily, as a matter of course or as a matter of discretion. . .

"I charge you further that if you believe beyond a reasonable doubt that the state has proved existence of either one or more of the statutory aggravated circumstances about which the court has charged you, you may recommend the Defendant to the mercy of the court."

We do not know how the court could have made it clearer that the death penalty was not mandatory on a finding of aggravating circumstances and that the law was to come exclusively from the court. Under these circumstances, any possibility that the jury was misled by the district attorney on this issue is illusory.

Enumeration 8 is without merit.

8. Enumeration 9 alleges that: "The sentence of death must be vacated because it was imposed under the influence of passion, prejudice and other arbitrary factors, in violation of Georgia law and the due process and equal protection clauses of the Georgia Constitution and the Fourteenth Amendment of the Constitution of the United States."

Inasmuch as this is one of the determinations this court is required to make pursuant to Code Ann. § 27-2537(c)(1) the merits of this enumeration will be considered in our sentence review.

Otherwise, Enumeration 9 merely restates enumerations already found to be without merit and requires no separate discussion.

III. Sentence Review

Under *Atkins v. Hopper,* 234 Ga. 330 (3) (216 SE2d 89) (1975) and *Stanley v. State,* 240 Ga. 341 (1977) (see also *Burke v. State,* 234 Ga. 512, 514-518 (216 SE2d 812) (1977)) the conviction and death penalty for armed robbery must be set aside as contrary to law in that one may not be convicted and sentenced for both a felony murder and for the lesser included felony on which the felony murder conviction rests.

Our remaining sentence review concerns only the death sentences imposed on Joseph Thomas for murder and kidnapping.

We have followed the mandate of the statute (Ga. L. 1973, p. 159 et seq.; Code Ann. § 27-2537 (c) (1-3)) as we have in each case involving a death penalty under this statute, considering the aggravating circumstances found by the jury and the evidence concerning the crimes. We conclude that the sentences of death imposed on Joseph Thomas for murder and kidnapping were not imposed under the influence of passion, prejudice or any other arbitrary factor. We have previously considered the constitutionality of the death penalty for kidnapping with bodily injury and have concluded that it is not unconstitutional. *Stanley,* supra. See also Coker v. Georgia, 432 U. S. —, (1977); *Collins v. State,* 239 Ga. 400 (236 SE2d 759) (1977).

The jury found as statutory aggravating cir-

cumstances to the murder the following: 1. "The accused committed the offense of murder for himself for the purpose of receiving money and other things of monetary value" (Code Ann. § 27-2534.1(b)(4)), and 2. "The offense of murder . . . [was] outrageously and wantonly vile, horrible and inhuman in that the offense[s] involved defendant's depravity of mind and torture to the victim" (Code Ann. § 27-2534.1(b)(7)).

The jury found as a statutory aggravating circumstance to the kidnapping that "The offense of kidnapping was committed while the accused was engaged in the commission of other capital felonies, to-wit, murder and armed robbery" (Code Ann. § 27-2534.1 (b) (2)).

The evidence supports the jury's findings.

Thomas urges in mitigation that at some time prior to the offense he ingested two of four pills the chemical content of which was unknown and that he did not remember the circumstances of the crime. His counsel elicited from a psychiatrist-witness the admission that it was always possible to have an allergic reaction to drugs. Thomas offered no evidence of prior allergies, no identification of the substance ingested, and, when taken to his home, he could not locate the other two pills he had allegedly secreted there. After the offense but before the body was discovered he had called the police authorities in an attempt to mislead them. After apprehension he clearly related how the offense took place and his part in it including his driving the victim's car away while his confederate held the victim at gunpoint. In sum, his testimony concerning the pills and the subsequent loss of memory is wholly without corroboration and completely inconsistent with the other evidence offered at the trial.

If the evidence is to be believed, the murder and robbery of Clifford Floyd were planned weeks in advance by Thomas and Ivon Stanley. On the day of the offense Floyd was decoyed and robbed at gunpoint of the cash on his person by Ivon Stanley, while Thomas rifled and disposed of his car. When Thomas returned he and Ivon Stanley took the victim into the woods where Thomas personally struck him on the head with a hammer, shot

him with a pistol, jabbed him with the cutting point of a shovel and buried him alive as he was still trying to say something.

We conclude that Joseph Thomas' sentences to death for murder and kidnapping are not excessive or disproportionate to the penalty imposed in similar cases considering both the crime and the defendant, and that the evidence supports the verdict.

In reviewing the death penalties in this case, we have considered the cases appealed to this court since January 1, 1970, in which a death or life sentence was imposed and we find that the similar cases listed in the Appendix support affirmance of the death penalties in this case.

Thomas' convictions and death sentences for murder and kidnapping with bodily injury will be affirmed. His conviction for armed robbery will be reversed.

*Judgment affirmed in part, reversed in part. All the Justices concur.*

ARGUED JUNE 15, 1977 — DECIDED NOVEMBER 28, 1977 — REHEARING DENIED DECEMBER 19, 1977.

*Mary M. Young, Millard C. Farmer, Jr.,* for appellant.

*A. Wallace Cato, District Attorney, Arthur K. Bolton, Attorney General, Daryl A. Robinson, Staff Assistant Attorney General,* for appellee.

APPENDIX.

*House v. State,* 232 Ga. 140 (205 SE2d 217) (1974); *McCorquodale v. State,* 233 Ga. 369 (211 SE2d 577) (1974); *Floyd v. State,* 233 Ga. 280 (210 SE2d 810) (1974); *Jarrell v. State,* 234 Ga. 410 (216 SE2d 258) (1975); *Berryhill v. State,* 235 Ga. 549 (221 SE2d 185) (1975); *Birt v. State,* 236 Ga. 815 (225 SE2d 248) (1976); *Gibson v. State,* 236 Ga. 874 (226 SE2d 63) (1976); *Harris v. State,* 237 Ga. 718 (230 SE2d 1) (1976); *Young v. State,* 237 Ga. 852 (230 SE2d 287) (1976); *Dix v. State,* 238 Ga. 209 (232 SE2d 47) (1976); *Blake v. State,* 239 Ga. 292 (236 SE2d 637) (1977); *Young v. State,* 239 Ga. 53 (236 SE2d 1)

(1977).

KIDNAPPING CASES.

*Henderson v. State,* 227 Ga. 68 (179 SE2d 76) (1970); *Akins v. State,* 231 Ga. 411 (202 SE2d 62) (1973); *Eberheart v. State,* 232 Ga. 247 (206 SE2d 12) (1974); *Jarrell v. State,* 234 Ga. 410 (216 SE2d 258) (1975);*Peek v. State,* 239 Ga. 422 (1977); *Stanley v. State,* 240 Ga. 341 (1977) (a companion case).