## 74605. RACHALS v. THE STATE.
### (361 SE2d 671)

DEEN, Presiding Judge.

The appellant, Terri Rachals, a nurse employed in the Surgical Intensive Care Unit of the Phoebe Putney Memorial Hospital, of Albany, Georgia, was indicted and tried on six counts of murder and twenty counts of aggravated assault, allegedly caused by the administration of potassium chloride to patients in the intensive care unit. The jury returned verdicts of "not guilty" on all murder charges, and 19 counts alleging aggravated assault. Mrs. Rachals was found "guilty but mentally ill" of aggravated assault, with intent to murder, of Sam Bentley, by injecting potassium chloride into a bag of fresh frozen plasma, which was then introduced into Bentley's body while he was a patient in the Intensive Care Unit of the Phoebe Putney Hospital.

Following an unusual increase in the number of cardiac arrests of patients in the Phoebe Putney Hospital during the latter part of 1985, investigations were conducted by the Georgia Department of Human Resources and the Georgia Bureau of Investigation. Following these investigations, Rachals was arrested for the various charges of murder

and aggravated assault. *Held:*

1. In a hearing to determine the voluntariness of a statement Rachals made to the investigating GBI agents, a Dr. Turner was allowed to testify that when he spoke with Rachals shortly after her confrontation by the GBI agents, Rachals appeared to be able to tell right from wrong. Rachals contends that this testimony violated the psychiatrist-patient privilege established by OCGA § 24-9-21.

Before the psychiatrist/patient communications privilege arises under OCGA § 24-9-21, a relationship of psychiatrist and patient must exist, to the extent that treatment was given or contemplated. *Massey v. State*, 226 Ga. 703 (177 SE2d 79) (1970). The most realistic view of the evidence simply is that the appellant's real concern was more to avoid the immediate reality of spending the night in jail, rather than seeking psychiatric treatment. Certainly the appearance of the psychiatrist resulted from the efforts of others.

The record shows that following her statement to the GBI agents, the appellant asked the head nurse to call Dr. Calhoun, in whom she had previously confided about her emotional and domestic problems. In response to the appellant's remark that she would kill herself if she had to go to jail, Dr. Calhoun replied that they would try to get her some help. Dr. Turner was then summoned, and, after talking with the appellant for a few minutes, asked her if she would consent to a voluntary admission into the psychiatric ward. Not surprisingly, the appellant readily assented.

She remained in the ward only until the following morning. It does not appear that she received treatment of any kind during this brief retreat to the psychiatric ward, and upon her release (in the custody of the police) she never again sought the services of Dr. Turner. Under these circumstances, no psychiatrist/patient relationship was created because (1) the appellant certainly was not seeking out psychiatric care in the usual sense of the term; and (2) no real treatment was given or contemplated. Accordingly, no communications privilege restricted the admissibility of Dr. Turner's testimony.

In any event, even if a psychiatrist/patient relationship existed between Dr. Turner and the appellant, any error in the admission of Dr. Turner's testimony was harmless. The objectionable testimony was Dr. Turner's opinion that the appellant appeared to know right from wrong at the time he talked with her. During the trial, two other psychiatrists, who had evaluated the appellant, also testified that in their opinions the appellant's emotional problems did not interfere with her ability to tell right from wrong. Thus, because Dr. Turner's testimony was cumulative of other, properly-admitted evidence, reversal is inappropriate. See *Wilson v. Bonner*, 166 Ga. App. 9 (5) (303 SE2d 134) (1983); *Caston v. State*, 178 Ga. App. 752 (344 SE2d 725) (1986).

2. The taped statement of Rachals to the GBI agents is not subject to the objection that it is inadmissible because it is "hearsay." *Sanders v. State*, 246 Ga. 42 (268 SE2d 628) (1980); *Thomas v. State*, 240 Ga. 393 (2) (242 SE2d 1) (1977); *Stanley v. State*, 240 Ga. 341 (3) (241 SE2d 173) (1977). Further, whether an accused is mentally capable of, and did in fact make a knowing and intelligent waiver of her *Miranda* rights, is a factual and credibility issue for the trial court and will not be disturbed on appeal unless clearly erroneous. *Evans v. State*, 176 Ga. App. 818, 820 (338 SE2d 48) (1985).

3. Appellant also enumerates as error the testimony of Dr. Adelle Franks, which by inference could be interpreted to mean that "Terri Rachals was, by odds of five out of nine, probably guilty." Dr. Franks was an epidemiologist, from the U. S. Center for Disease Control, on loan to the Georgia Department of Human Resources. The Georgia DHR had requested assistance in evaluating the increase in the number of cardiac arrests occurring in the Phoebe Putney Hospital. Dr. Franks went to the hospital in December 1985, and examined the hospital's records for the entire year previous to November 1985. In three of those months, the hospital had experienced no cardiac arrests. In two months, four cardiac arrests had occurred in each month. Accordingly, Dr. Franks stated that the hospital should have between zero and four cardiac arrests in a normal month. However, in the month of November 1985, eleven cardiac arrests had occurred on the 3:00 o'clock to 11:00 o'clock shift. The probability of this occurring "by chance alone is less than one in a trillion." In the month of November, five cardiac arrests had occurred in one day and one patient had a total of eight cardiac arrests in that one month. Dr. Franks listed all cardiac arrest patients for the period investigated and the primary nurse on duty with that patient. Rachals was the primary nurse for 11 cardiac arrest patients in the month of November. No other nurse was the primary care nurse for more than one cardiac arrest patient. Dr. Franks charted all 24 nurses for that month and the number of cardiac arrests that occurred on their shift, and those that occurred when they were not on shift to calculate a "rate ratio." The "rate ratio" for most nurses was around one, while the "rate ratio" for Rachals "was 26.6, which means that in 26.6 times, it was more likely that a cardiac arrest would occur while she was on duty than when she was not on duty. . . . [T]he rate ratio show infinitely large and unmeasurable [sic] because all of the cardiac arrests that occurred on the 3:00 o'clock to 11:00 o'clock shift occurred while she was on duty." Rachals's counsel contends that this testimony impermissibly invaded the province of the jury, in that it concluded that if a crime occurred while Rachals was on duty, the odds were 26.6 to 1 that she did it.

GBI Agent Sweat testified that of the 19 cardiac arrests that occurred during the investigative period, Rachals was charged with

every cardiac arrest which occurred while she was on duty. Since she was not present when eight occurred, she was not charged with them. Six cardiac arrests occurred on one day, November 24, although it was not normal for more than four cardiac arrests to occur within a one-month period. Rachals was not charged with three of them since she was not present. Dr. Franks admitted that four cardiac arrests within a one-month period would be considered normal and she could not tell you which of any of the cardiac arrests that occurred when Rachals was on duty could be considered to be normally expected.

In *Williams v. State*, 251 Ga. 749 (312 SE2d 40) (1983), the Supreme Court was faced with an allegation of error "in permitting a state's expert witness to discuss mathematical probabilities concerning the fiber evidence and in permitting the prosecutor to argue mathematical probabilities to the jury." Id. at 786. The court found no error "as experts are permitted to give their opinions, based upon their knowledge, including mathematical computations." Id. This enumeration was not exhaustively discussed, because of the numerous allegations of error in the *Williams* case, but it appears to sanction "mathematical probabilities concerning . . . evidence," including evidence which circumstantially permits an inference of guilt. While no one would doubt the admissibility of the raw data to a jury about what acts occurred on which nurses' shifts, we have serious reservations about mathematical computations as to the probability of guilt of an accused person. However, we are constrained to follow *Williams*, supra, and find no reversible error under the facts of this case.

Other jurisdictions have been even less open to the admissibility of such matters of statistical and mathematical probability. In *People v. Collins*, 66 Cal. Rptr. 497 (438 P2d 33) (1968), for example, the Supreme Court of California disallowed the use of a mathematical formula to establish the presence of the two defendants at the scene of the crime. That court determined that the statistical analysis was invalid due to the large number of variables that could be duplicated in the uncontrolled environment. There the odds were listed as one in twelve million that the asserted fact occurred by chance, as compared to one in a trillion in the case sub judice. For a simple, lucid, and informative guide to mathematical, statistical analysis, and suggested formulas advanced for alleged arithmetical accuracy, this writer invites reference to the Appendix contained in *Collins*.

In the instant case, however, the number of variables was limited in the controlled situation, and the statistics were not derived from a random sampling. Rather, hospital records established the average number of cardiac arrests for the entire year prior to November 1985, when the dramatic increase in the number of cardiac arrests was noticed. The potential for analytical error that was apparent in *Collins* is absent in the instant case. When in doubt, evidence of this type

should be admitted, unless based on sheer speculation, *Woods v. Andersen*, 145 Ga. App. 492, 496 (243 SE2d 748) (1978), although it may be totally rejected by the jury. While "these observations are made to emphasize the caution with which the courts should greet such presentations of statistical probability in criminal proceedings," *Brooks v. State*, 171 Ga. App. 55, 57 (318 SE2d 785) (1984), the testimony was admissible in this case, for whatever value the jury assigned it.

4. Rachals also contests the sufficiency of the evidence to show her guilt as to the aggravated assault upon Sam Bentley. Dr. Douglas Calhoun was Bentley's attending physician. While at a meeting he received word that Bentley's heart rhythm and blood pressure did not appear to be stable. He immediately went to his bedside and after examination ordered fresh frozen plasma to be administered. Janice Thomas was the primary nurse for Bentley but Rachals went to the lab and procured the fresh frozen plasma. Thomas does not remember which nurse hung the plasma. In her recorded statement to GBI Agent Sweat, Rachals told him Mr. Bentley asked her to "let him die." He was "very, very ill also. His skin was sloughing off and he was just laying there suffering and he'd just look at you and just ask you to let him die. So when I went to pick up the fresh frozen plasma, I inserted 20 mil equivalents [of potassium chloride] and they hung it and he arrested, but he did not die." Nurse Thomas had left the room and when Rachals saw Bentley's "QRS started widening," she notified Dr. Calhoun and assisted in stabilizing Bentley. Dr. Calhoun testified that while he was present Bentley exhibited "a very bizzare unusual set of things . . . a very spectacular, sudden set of irregular heartbeats and rapidly went into . . . cessation of heart function. . . ." Nurse Rachals called Dr. Calhoun's attention to Bentley's EKG widening, "which is indicative of potassium intoxication." The medical team was successful in resuscitating Bentley.

We find this evidence sufficient to authorize a rational trier of fact to find Rachals guilty of aggravated assault beyond a reasonable doubt. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

5. Rachals' remaining enumerations of error are without merit.

*Judgment affirmed. McMurray, P. J., Banke, P. J., and Benham, J., concur. Beasley, J., concurs in the judgment only. Birdsong, C. J., Carley, Sognier and Pope, JJ., dissent.*

BIRDSONG, Chief Judge, dissenting.

I respectfully dissent from Division 1 of the majority opinion and the judgment. I cannot concur with the decision that no psychiatrist-patient relationship was created between Dr. Turner and Ms. Rachals. Neither can I agree with the conclusion that "no real treat-

ment was given or contemplated." The record is devoid of any evidence on this question, and the majority concludes from a silent record, not only that no treatment was given, but surmises that none was "contemplated." Dr. Turner was never asked whether he prescribed any medication for Ms. Rachals and the subject of whether he "contemplated" further treatment or medication in the event she did not show improvement was never raised. If it is acceptable appellate procedure to assume the critical facts from a silent record, then an appellate court need never reverse another judgment, even if the State offers no evidence. We can assume what the evidence would show if it were admissible, and if it were admitted.

Our Code establishes as privileged, "[c]ommunications between psychiatrist and patient. . . ." OCGA § 24-9-21 (5). Therefore, the testimony of a psychiatrist is inadmissible against his patient because of its privileged status. *Kimble v. Kimble*, 240 Ga. 100, 101 (239 SE2d 676); *Wilson v. Bonner*, 166 Ga. App. 9, 16 (303 SE2d 134). In the instant appeal, the District Attorney on March 17, 1986, filed a petition with the trial court requesting psychiatric examination of Rachals after he concluded "defendant may be suffering from mental illness. . . ." On April 29, 1986, defendant's counsel filed his notice of intent to raise the issues of insanity and mental incompetence. Hence, the sanity of Rachals was a viable issue and the State chose to attack the question head-on and called Rachals' psychiatrist to establish her sanity. The State called Dr. Allen Turner and questioned him as to whether Rachals "knew the difference between right and wrong at the time you were talking to her." The trial court permitted Turner to answer, over objection on the basis of privileged communication between a psychiatrist-patient, and that Dr. Turner's conclusions were "based on those communications."

During Rachals' interrogation by the GBI agents, she "asked . . . or made [the] statement she might need some help. . . ." She asked that the head nurse, Diane Hall, be present. Following the interview Rachals asked Hall "to call Dr. Calhoun; she wanted to talk to him; she had been trying to talk with him for a couple of weeks and had not been able to reach him." Dr. Calhoun spoke with Rachals and after Rachals told him something about "killing herself," said: "Well, we'll get you some help." Shortly thereafter, Dr. Turner arrived and spoke to Rachals for approximately 15-30 minutes on the ninth floor and diagnosed her as "suicidal and very, very depressed." He asked her to accept voluntary admission to the psychiatric unit of the hospital because "he feared for her safety[,] that she might well try to harm herself. . . ." That evening, Dr. Turner again spoke to Rachals on the seventh floor. He released Rachals about mid-morning of the following day after he concluded she was no longer "a threat to herself . . . to the extent that . . . she couldn't be released to the sher-

iff's office."

Dr. Turner was asked: "[D]id you consider Terri Rachals to be your patient at this time? A. At that time as I talked with her." "I admitted her to the hospital under my care on the seventh floor." Rachals had been seeking medical help for her mental health for more than two weeks. These facts are contrary to the majority's conclusion that Rachals was not "seeking out psychiatric care in the usual sense of the term." Dr. Turner considered Rachals to be his patient, he had consulted with her on the ninth floor for 15-30 minutes. He diagnosed her as "suicidal and very, very depressed." His prescribed treatment was admission to the hospital's psychiatric unit, because "he feared for her safety. . . ." This latter testimony of Rachals' psychiatrist is contrary to the majority's assertion that "appellant's real concern was more to avoid the immediate reality of spending the night in jail. . . ." It was the psychiatrist's medical treatment for his patient by prescribing a night in the psychiatric ward that was responsible for the decision of where Rachals spent the night. A second consultation took place between Dr. Turner and his patient on the seventh floor, presumably in the psychiatric ward, because that is where Rachals spent the night. The record is silent as to what treatment or medication Dr. Turner prescribed for his patient that evening or upon her admission to the psychiatric ward. The majority has concluded from the blank record that "no real treatment was given or contemplated." To the contrary, if it is acceptable appellate practice to make assumptions from a silent record, it is far more plausible, likely, and realistic, that a psychiatrist who had diagnosed his patient as being "suicidal and very, very depressed," who was threatening to take her life, was facing multiple murder charges, and it was necessary to confine her to a psychiatric ward, that the doctor would prescribe some medication to calm his mental patient and assist her through this crisis.

The majority finds it relevant and convincing that Rachals did not see Dr. Turner after her release to the sheriff. Four psychiatrists and one psychologist who saw Ms. Rachals on a continuing basis following her arrest, for the ensuing year during her stays at Central State Hospital and the Georgia Regional Hospital at Augusta, testified at the trial to their consultations, and the Superintendent of the Georgia Regional Hospital at Augusta stated that Rachals had been examined by so many psychiatrists she wrote on the wall: "Leave me alone, damn it." It is safe to conclude that the most distasteful situation to which Ms. Rachals could have been subjected was to another consultation with another psychiatrist.

The majority also holds that even if the psychiatrist-patient relationship existed any error in the admission of Dr. Turner's testimony was harmless because it was cumulative of other properly-admitted evidence. I agree that two psychiatrists appearing as state's witnesses

testified that Rachals could distinguish between right and wrong, but Dr. Craig was asked "whether or not during the months of October and November of 1985 and February of '86, that the Defendant in this case knew the difference between right and wrong," and Dr. Hall was asked: "on the dates of the alleged crimes, which were in October and November of 1985 and February of 1986, whether or not she knew the difference between right and wrong on those times?" The question posed by the State to Dr. Turner, the appellant's psychiatrist, was: "Now, based on your conversation with her on the seventh and ninth floors [on March 13, 1986], do you have an opinion as to whether or not she knew the difference between right and wrong *at the time you were talking to her*?" (Emphasis supplied.) Drs. Craig and Hall testified to the ability of Rachals to distinguish between right and wrong in October and November 1985 and February 1986. Dr. Turner testified only as to the period on March 13, 1986. Because different time periods are involved they are not "cumulative."

We should note that the same Code section that establishes privileged communications between psychiatrist-patient, establishes privileged communications between attorney-client. In *Almond v. State*, 180 Ga. App. 475 (349 SE2d 482), this Court condemned using a defendant's counsel to establish his client's competency, when such opinion was based on conversation between the attorney and his client. In the instant appeal, the State is using the patient's psychiatrist to establish her sanity, when such opinion is based on conversation between the doctor and his patient during such relationship. The rule established in *Almond* is applicable here, the same code section that establishes the confidential relationship between an attorney and his client, establishes the same relationship between a psychiatrist and his patient. In the case at bar, the psychiatrist consulted with his patient on three occasions, first diagnosed her as suicidal and depressed, placed his patient in the psychiatric ward under his care, and on the following day again diagnosed his patient as sufficiently improved that she could be released from the hospital. Dr. Turner was never asked whether he used any particular form of psychiatric therapy during his consultations with Rachals, nor was he asked if he prescribed any medication to treat a depressed and suicidal patient facing a crisis involving multiple murder charges, who was threatening to kill herself. If those questions had been asked, Dr. Turner was under the Codal proscription that "[n]o physician . . . shall be required to release any medical information concerning a patient except on written authorization or other waiver by the patient . . . or on appropriate court order or subpoena. . . ." OCGA § 24-9-40. However, we need not concern ourselves with this statute, since under the majority view, no amount of consultation between a psychiatrist and patient can establish such a relationship. Thus, if a psychiatrist only consults

with a patient he is now free to publish any information given him by this person who is not his patient.

The majority's holding is also cause for concern on another matter. Since the same Code section that establishes the confidentiality of communications between the psychiatrist and his patient, also establishes the same relationship between an attorney and his client, and no amount of consultation between a psychiatrist and his patient establishes the privilege — can an attorney who has consulted with a criminal defendant be required to divulge the information given him by this person who is not a client because all that occurred was a consultation? The rule espoused by the majority may resolve this appeal, but it creates more problems for doctors and lawyers than it solves.

I, therefore, respectfully dissent.

I am authorized to state that Judge Carley, Judge Sognier, and Judge Pope join in this dissent.

DECIDED SEPTEMBER 10, 1987 —
REHEARING DENIED OCTOBER 2, 1987 — 

*George P. Donaldson III, Reginald J. R. Bell, Jr.*, for appellant.
*Hobart M. Hind, District Attorney, John W. Hogg, Melodie B. Swartzbaugh, L. Earl Jones, Assistant District Attorneys*, for appellee.